WILLIAM A. DE KAY *vs.* CHICAGO, MILWAUKEE & ST. PAUL RAILWAY
COMPANY.

July 3, 1889.

**Railway — Passenger leaving Train during Stop at Way Station. —**
Where a passenger enters a railway train and pays his fare to a particu-
lar place, his contract does not obligate the company to furnish him with
means of egress and ingress at an intermediate station; and if he leaves
the train at such a station, he for the time being surrenders his place as
a passenger, and takes upon himself the responsibility of his own move-
ments. But if he leaves without objection on part of the company,
he does no illegal act, and has a right to re-enter and resume his journey.

**Same—When Train is Sidetracked—Duty of Company to Passenger
crossing Main Track—Duty of Passenger— Plaintiff held Negli-
gent.—**While, if a railway company permits the practice of passengers
leaving and re-entering their train, while on a side track at an interme-
diate station for the purpose of letting another train pass on the main
track, it is bound to use *reasonable care not to expose such passengers to
unnecessary danger,* yet it is *not* bound to so regulate its business as to
make the side track as safe a place of ingress or egress as the station
platform; nor does it give any assurance, under such circumstances, to
passengers that no trains will pass while they are crossing or recrossing
the main track. Neither does the call of "all aboard" by the conductor
of the side-tracked train give an assurance to those who have left their
train that they may cross the main track in safety without looking for
approaching trains. Passengers who have thus left their train, when
they attempt to cross the track under these circumstances, are bound to
exercise *reasonable care and caution to avoid injury from passing trains,*
and must use their senses for that purpose. The station platform and
not the side track is the proper place to enter or leave a train; and those
who, for purposes of their own, use the latter, assume all the extra risks
necessarily incident to such a practice, and are bound to exercise a de-
gree of care corresponding to the increased risks.

Appeal by defendant from an order of the district court for Free-
born county, *Farmer*, J., presiding, refusing a new trial after verdict
of $5,500 for plaintiff. The action was for personal injuries, and
the place of the accident is thus shown in Exhibit A, mentioned in
the opinion:

1. Depot and Platform.
2. East Side Track.
3. Main Track.
4. West Side Track.
5. Warehouses.
6. Stock-Yard and Chute.
7. Switches.

*H. H. Field*, for appellant.

*A. J. Edgerton, Geo. B. Edgerton, W. H. De Kay, Lovely & Morgan,* and *Walter J. Trask,* for respondent.

MITCHELL, J.    This was an action for damages for personal injuries alleged to have been caused by the negligence of defendant.

The defendant denies the alleged negligence on its part, and charges negligence on part of plaintiff. The trial resulted in a verdict for the plaintiff, and the question is whether this was justified by the evidence.

Plaintiff, at Mitchell, Dakota, entered a mixed train of defendant going south, as a passenger for Sioux City, Iowa. The regular place for this train and a north-bound train (also mixed) to pass each other was at the intermediate station of Parkston, a small prairie village 24 miles south of Mitchell. At that station there is a depot and a platform west of and adjoining the main track, the platform extending north and south about 100 feet each way from the depot. East of and parallel with the main track, and nine feet distant from it, is a side track, which connects with the main track at a switch some 800 feet south of the depot. There is another side track west of the depot and about 55 feet from the main track, which also connects with it at a switch a little south of the east-side-track switch. Both these side tracks extend about 450 feet north of the depot and there connect with the main track. The village of Parkston is located west of the depot, and consists principally of one street (Main) running east and west down to the depot grounds. If extended easterly this street would cross the main track at the south end of the depot platform. The crossings at this point are planked, and the ground is level between the tracks. The depot platform is three or four steps above the level of the railway tracks. Adjoining the depot grounds on the west, and 200 feet distant from the main track, is what is platted as Depot street, 80 feet wide and running north and south. On the west of the west side track, and south of what would be Main street if extended east, are two warehouses and a small stock-yard and chute. To a person coming eastward from the village to the station, on reaching the west side of Depot street there would be an unobstructed view of the railroad to the south, which would continue until he came opposite the warehouses and stock-yard referred to, which would obstruct it for a short distance; then, on reaching the west side track, the view would again be unobstructed and continue so until the person would reach the main track—a distance of 55 feet in a direct line. The country be-

ing level prairie, the railroad would be in plain sight for a long dis-
tance.   This will all be more fully understood by reference to the
map, Exhibit A.

On the day in question the train on which plaintiff was a passen-
ger arrived at Parkston on time, drew up on the main track along-
side the depot platform, and stopped a few minutes doing its work of
receiving and discharging freight and passengers.   The north-bound
train was late this day, and the conductor of plaintiff's train, having
received orders to hold for it, after finishing his work at the depot
backed his train (consisting of an engine, four freight cars, a combi-
nation car, and passenger coach) up over the north switch, and ran
it down on the east side track, and stopped opposite the depot, with
the engine near the street-crossing at the south end of the platform.
The object, of course, was to let the north-bound train pass, as it had
the right of way on the main track.   Before this, however, when
plaintiff's train arrived at the station, it seems some of the passen-
gers, including the plaintiff, got out upon the platform, when the con-
ductor stated to some one, in plaintiff's hearing, that the other train
was late, and that he would have to wait for it, and that they would
have time to go up town.   There is a conflict of evidence as to how
long the conductor said the train would have to wait, but we must
accept as true the evidence most favorable to the plaintiff, viz., "20
or 30 minutes."   In consequence of this statement the plaintiff left
the station and went up into the village, made one or two small pur-
chases, and started to return, coming down the south side of Main
street; and at or just before he reached the west side track, as he
testifies, he heard the conductor call "all aboard" and the bell ring,
and saw the train commence to move.   This we also accept as true,
although from other evidence as to subsequent occurrences it would
seem not improbable that he under-estimates his distance from the
depot when he heard the call.   We must also accept as true his state-
ment that he had not been absent from the depot over 15 minutes,
and hence that the time the conductor had stated the train would
wait had not yet fully elapsed.   .The cause of the conductor's calling
"all aboard," etc., was the approach of the north-bound train.   It
does not positively appear just where this train was when the con-

ductor made the call, but the general purport of the evidence is that its head was at or a little inside the south switches.   There is much conflict of evidence as to the rate of speed at which this train approached the station, and as to whether it blew a whistle or rang a bell.   But here again we must accept as the facts that it approached at an unusual and high rate of speed, and that it gave no signals.

Returning now to the plaintiff, when he heard the cry of "all aboard," etc., he started and ran as fast as he could diagonally across the street to the platform, up the steps, and then northerly on the platform some forty feet, and then jumped diagonally, with his face northeasterly, right on to the main track, and was *instantly* struck by the north-bound train, and received the injuries complained of.   Plaintiff knew before he left the depot that this train was expected, and that was what his train had to wait for.   He was a young man in full possession of all his senses, and the day was calm and clear.   He never looked to the south or took any other precaution to ascertain if a train was approaching from the direction, although, for at least the last 100 feet that he ran, the view to the south was unobstructed, and he could and must have seen the train if he had turned his head in that direction.   He testifies that he supposed that this train was so late that his train was not going to wait for it, but he gives no reason for this impression, and none is apparent unless it is the fact that his train was pulling out a little sooner than the conductor said it would.   It is evident that when plaintiff jumped upon the track he did so almost in front of the engine.   As one witness expressed it, "the engine was just ready to crawl onto him ;" another, "he jumped right in front of the engine ;" and still another, "I thought he wanted to kill himself from the way he jumped." The plaintiff testifies, "I heard the cry of ' all aboard ' just about the time I jumped."   If he meant by this that the conductor called a second time he is uncorroborated by any other witness.   But even if this was so, it is pretty apparent that it had no influence one way or the other on his action, as it is evident from his hasty and excited manner that this was already predetermined.

It appears that all who were on the platform or immediately at the station when the call of "all aboard" was given, who desired to do so,

crossed over the main track to their train in safety before the north-bound train reached the depot; also that no one else attempted to cross over as late as the plaintiff, three other passengers who, like plaintiff, were coming from the village when the signals for starting were given, stopping on the west side of the main track at the street-crossing until the train passed. There is no evidence that the conductor knew where the plaintiff was when he called "all aboard." It is also a fact, not without significance, that of all those who were around the station on that occasion, whether passengers or by-standers, who were examined as witnesses, plaintiff was the only one who did not see the north-bound train before it reached the station.

We think that the evidence justified the jury in finding that the defendant was negligent at least in the matter of running the north-bound train into the station at such a rate of speed without giving any signals of its approach, especially in view of the fact that at the south end of the depot platform there was what was used as a street-crossing. But we are also of opinion that, taking as true every fact favorable to the plaintiff and every one unfavorable to the defendant which there was any evidence reasonably tending to prove, there is no room for any other conclusion than that the plaintiff was grossly negligent in jumping upon the track without taking the least precaution to ascertain whether a train was approaching.

To relieve him from the charge of negligence in this respect, the chief contention of his counsel is that the act of the conductor in calling "all aboard" was an assurance to him that he could cross the track in safety; that the rule as to "looking and listening" does not apply to a case like this; that a passenger crossing a track at a station, to leave or get on his train, has a right to assume that the railway corporation will so regulate its trains that it will be safe for him on the track which he is thus invited and required to cross in order to leave the train or to secure his passage. And numerous cases are cited to the proposition that the highway-crossing rule has no application to a case where, by the arrangement of the corporation, it is made necessary for passengers to cross the track in going to or from the depot to the cars.

Properly applied, there is no doubt as to the correctness of this

proposition. But we think it will be found, in every case where this rule has been applied, that the cars were standing at the place appointed and designated by the corporation for the exit or entrance of passengers. Such are the cases of *Terry* v. *Jewett,* 78 N. Y. 338; *Brassell* v. *N. Y. Cent., etc., R. Co.,* 84 N. Y. 241; and *Klein* v. *Jewett,* 26 N. J. Eq. 474. But here the situation was altogether different, and consequently the rights and duties of the parties were also different. In the first place, plaintiff was not a passenger for this station. Where a passenger enters a railway train and pays the regular fare to be transported from one station to another, his contract does not obligate the corporation to furnish him with safe egress or ingress at any intermediate station. In the next place, this side track was not the designated or appointed place for the egress or ingress of passengers. The place for that was at the platform on the main track. That was the place where it did such work; it was run in upon the side track solely for the purpose of letting another train pass. Under such circumstances, as has been well said in one case, the duty and safety of passengers both concur in saying to those not destined for that station that they remain in the cars. That is the place of safety. The uncertainty as to when the other train may pass and as to its rate of speed, and the danger of crossing the track under such circumstances, are all suggestive of risk and of the necessity of great care and caution. But if a passenger, under such circumstances, with the permission of the corporation or without objection on its part, leaves the cars, he does no illegal act; he has undoubtedly the right to re-enter and resume his journey; but for the time being he surrenders his place as a passenger, and takes upon himself the responsibility of his own movements. If he remains near at hand when his train is about to start, the agents of the railway should give reasonable and seasonable notice for him to return to the car. But if he goes out of sight or hearing, he takes his chances of being left. The company is not bound to wait for him or send after him.

And while, if a railway corporation permits such a practice, it is bound to use reasonable diligence not to expose passengers to any unnecessary dangers while leaving or re-entering the train on the

side track, yet it is not bound to so regulate its business as to make a side track as safe or convenient a place of ingress or egress as the station platform.   The side track is not made for any such purpose. The passenger is using it for this purpose solely for his own convenience or pleasure, and he must assume the risks necessarily incident to such a practice, and is bound to use a degree of care corresponding to the increased risks.   The company gives him no assurance that, while crossing or recrossing the track, no other train will pass. On the contrary, the very purpose for which the train is put upon the side track, as well as all experience, negatives any such presumption.   If a passenger will leave his train under these circumstances, when he attempts to cross the track for the purpose of re-entering it he is bound to exercise reasonable care and caution to avoid injury from passing trains.   This was just the situation of the plaintiff. He had left his train for purposes of his own.   He knew that it was run in upon the side track for the express purpose of letting the other train pass.   Common experience should have taught him that the usual practice is, when a train is delayed for the passing of another train, for the former to "pull out" as the other "pulls in."  So far from the conductor's call of "all aboard" being an assurance to him that no other train was approaching, it amounted, under the circumstances, almost to an express warning that the delayed train was approaching.   No call of "all aboard" from the conductor could justify him in recklessly obeying, at the risk of his life.   He was not confronted with the dilemma of choosing immediately between two dangers.   It was at most a question of inconvenience in being left and having to take a later train, which was no excuse for doing a positively dangerous act.   The fact that he heard no signals was no excuse for not looking.   He had ample opportunity to look.   To do so would not have appreciably delayed his progress.   He had but to turn his head to have seen the train.   Indeed so close to him was it when he jumped that it is hardly possible to conceive how any person in possession of his senses could have helped both seeing and hearing it even without looking around.   It is evident from the general tone of the testimony of the by-standers who saw him that his conduct impressed them as unaccountably reckless.   His acts cannot be ac-

counted for upon any other theory except that he had become so ex-cited as to have ceased to be in full possession of his senses, and so utterly oblivious to what was going on around him that he rushed recklessly into a danger patent to everybody else. This was no crime, or anything that should deprive him of sympathy on account of his misfortune, but it was such gross negligence as in our opinion to prevent a recovery in this action.

Order reversed.

NOTE. A motion for reargument of this case was denied July 16, 1889.