# CHARLESTON.

LAYNE, *Adm'r, v.* THE CHESAPEAKE & OHIO RY. CO.

Submitted June 11, 1908.    Decided November 23, 1909.

1. EXCEPTIONS, BILL OF—*Time for Signing and Certification.*
   Bills of exception may be signed, certified and made a part of the record of a trial, at any time within thirty days after the adjournment of the term at which the judgment in the action was rendered, either in vacation or in a special or regular subsequent term of the court, occurring within said period of thirty days.  (p. 610).

2. SAME—*Time for Signing and Certification—"In Vacation."*
   The office of the phrase "in vacation" in the clause of sec. 3979, Code of 1906, authorizing the taking of bills of exception after adjournment of the term at which judgment is rendered, is to empower the judge to sign, certify and make such bills parts of the record in vacation, not to limit or cut down the extension of time, impliedly granted for that purpose.  (p. 610).

3. MASTER AND SERVANT—*Injuries to Third Persons—Special Police Officers.*
   A special officer, appointed by the governor for police duty, at the instance of a railway company, under the authority conferred upon him by sec. 31 of ch. 145 of the Code, is *prima facie* a public officer, for whose act the company, procuring his appointment and paying him for his services, directly or indirectly, is not liable.  (p. 621).

4. SAME.
   Such a special officer has all the powers and privileges of a duly elected or appointed constable in the counties in which he files the oath taken by him, or copies thereof, and his public functions and powers are therefore more extensive than those of railway conductors, who are conservators of the peace only while in charge of their trains.  (p. 622).

5. CARRIERS—*Injuries to Third Persons—Special Police Officers— Dual Position.*
   A public officer, specially employed by a common carrier to perform certain duties and services for it, is a servant of such carrier, while acting within the scope of such employment; and, if such servant, in the performance of such duties, wrongfully inflict injury upon a passenger of such carrier, the master is liable therefor, although the injurious act, so done, was wilful

and malicious and prompted by motives and purposes, personal to the servant, such as resentment of insults or punishment for other wrongs perpetrated upon himself.    (p. 622).

6. MASTER AND SERVANT—*Injuries to Third Persons—Action—Question for Jury.*

When the capacity in which a person, occupying the dual position of public officer and servant of a carrier of passengers, acted in a transaction in which he inflicts wrong and injury upon third persons, is uncertain and dependent upon conflicting oral testimony and inconclusive facts and circumstances, the question is one for jury determination.    (p. 616).

7. CARRIERS—*Injuries to Passenger—Act of Employe.*

If the injured party is a passenger of such carrier and the officer acted, in the transaction in which the injury was suffered, in the capacity of servant of the carrier, the question of liability is determined by the legal principles applicable in cases of injury to passengers by ordinary servants of carriers.    (p. 615).

8. SAME—*Carriage of Passengers—Duty to Protect from Servants.*

A carrier of passengers is under an absolute contractual duty to protect them from wilful and unlawful injury at the hands of its servants.    (p. 617).

9. SAME—*Carriage of Passengers—Injuries—Use of Excessive Force.*

Provocation on the part of a passenger, such as interference with the servants in the exercise of their functions, abusive language, threats and assaults upon servants, although justifying expulsion from the train or other vehicle of carriage, does not bar recovery for injury inflicted upon him by the exercise of more force than is actually or apparently necessary to repel the assault or prevent other threatened injury.    (pp. 619, 621).

10. SAME—*Carriage of Passengers—Termination of Relation—Alighting from Train.*

A passenger does not cease to be such by reason of his alighting from a railway train at a station, other than his point of destination, for exercise or from motives of curiosity or to engage in an altercation with a servant of the company, if he does not leave the premises of the carrier, nor the train, with intention not to return to it and resume his journey.    (pp. 621, 626).

11. *Appeal and* ERROR—*Harmless Error—Exclusion of Evidence—Facts otherwise Established.*

In a case in which the person, inflicting injury upon a passenger, is both a public officer and a servant of the carrier, and his status as such officer has been established by one mode

66 W. Va.

of appointment or election, it is not reversible error to exclude evidence of appointment or election to the same office, or an office carrying the same power and authority, by another mode of conferring title, since no injury or prejudice could result from such error.   (p. 621).

12. CARRIERS—*Act of Servant—Injuries to Passenger—Actions—Instructions.*

If in the trial of such a case, the capacity in which such person acted is uncertain and dependent upon oral testimony and inconclusive facts and circumstances, the proper inquiry for the jury is the capacity in which he acted in the particular transaction to which the infliction of the injury was incident, not the places or positions he held or occupied in general at the time, and instructions, telling the jury to find for the defendant, if they believe the actor was, at the time of the injury, a public officer, or performing the duties of such officer, and that the defendant is not responsible for his acts as such officer, are calculated to becloud the issue and mislead the jury, for which reason, the trial court may properly reject them.   (pp. 621-625).

13. SAME—*Injuries to Passenger—Actions—Instructions.*

The trial court may properly reject an instruction, in such a case, which tells the jury they should find for the defendant, if they believe the actor was the servant of the defendant and that the injurious act, incident to the particular transaction in which he was engaged, was not within the scope of his duty as such servant.   (p. 622).

14. SAME.

In such case, an instruction which tells the jury the defendant is not responsible for the infliction of death on a passenger, if they find from the evidence that the assault was committed by the actor when he was acting for himself and as his own master, is calculated to mislead the jury and the trial court may properly refuse it.   (p. 626).

15. SAME.

The trial court may properly refuse, in such case, instructions telling the jury that, if the passenger left the defendant's train for the purpose of engaging in a quarrel or altercation with the servant or officer by whom he was killed, the carrier is not liable.   (p. 626).

16. TRIAL—*Request to Charge—Assumption of Fact.*

The trial court may properly reject an instruction which assumes the existence of a thing which the evidence makes an open question for the jury.   (p. 627).

17. WITNESSES—*Cross Examination— Discretion of Court.*

   The trial court has discretion to refuse to permit the elicitation of evidence on the cross-examination of a witness, that ought to be introduced by calling the witness to testify on behalf of the party seeking such evidence. (p. 629).

18. SAME—*Appeal and Error—Leading Questions—Discretion of Court.*

   The trial court has discretion to permit the asking of a leading question, when there is a basis for such action in evasiveness or reluctancy on the part of a witness, and a new trial will not be granted for allowing such question to be propounded, when it does not appear that the discretionary power has been abused to the injury of the party complaining. (p. 630).

Error to Circuit Court, Kanawha County.

Action by J. C. Layne, administrator against the Chesapeake and Ohio Railway Company. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Simms, Enslow, Fitzpatrick & Baker,* for plaintiff in error.

*A. M. Belcher, H. O. Middleton* and *Charles Curry,* for defendant in error.

POFFENBARGER, JUDGE:

J. C. Lane, administrator of the estate of Robert A. Lane, deceased, recovered a judgment against the Chesapeake & Ohio Railway Company, in the circuit court of Kanawha County, for the sum of $8,000.00, the declaration being predicated on the wrongful death of the deceased, caused by the defendant.

The bills of exception having been taken within thirty days after the adjournment of the term at which the judgment was rendered, pursuant to an order allowing the statutory period for obtaining the same, but, at special terms subsequently held within said period and not in the actual vacation of the court, a motion to dismiss for want of bills of exception, making the evidence a part of the record, raises an inquiry as to whether the instructions and evidence, rulings on which are the principal subjects of complaint, are parts of the record. As to whether the latter clause of section 3979 of the Code, 1906, allowing time for making up, signing and certifying bills of exception, after

adjournment of the term, requires these things to be done in vacation as well as within thirty days, in strict compliance with the letter thereof, or within the period of thirty days, let it be within a vacation or not, has never been decided by this Court. The clause has been interpreted in respect to the lapse of time. Bills of exception must be taken within the period of thirty days and cannot legally be taken later. *Crow* v. *Charlestown,* 62 W. Va. 91; *Jordan* v. *Jordan,* 48 W. Va. 600; *Jones* v. *Harmer,* 60 W. Va. 479; *Wells* v. *Smith,* 49 W. Va. 79; *Bank* v. *Wetzel,* 58 W. Va. 1. Practically all other decisions of this Court, relating to the sufficiency of bills of exceptions, involve questions other than the application of the statute or its interpretation. In requiring obedience to the time limit, we do not construe it. Being perfectly plain and unequivocal as to that, it is not susceptible of construction. We merely enforce it. It is said we have applied the rule of strict construction to it, but we find no evidence of this in any of the decisions. It is a remedial statute and falls under the liberal rule of construction, giving effect to the spirit, intent and purpose, more than to the letter. We have said the legislature intended by it to extend the time for the allowance of bills of exception. That is its purport. In saying this, we have not gone beyond its terms, and hence, have not construed it. The observation expresses the impression produced by the mere reading thereof. Extension of time is the substance of it. It contemplates nothing else. That is its main object. Was the phrase, "in vacation", intended as a limit upon the time granted? This depends partly on the sense in which it was used. No trial court holds more than three or four regular terms a year. The commencements of terms are fixed so as to apportion the work of the year by periods, according to time and accumulation of business. In most, if not all, of the circuits, the time, intervening between terms in one county, is presumptively occupied by a term or terms in one or more other counties. The time elapsing between the commencements of regular terms in each county runs from three to four months. Interventions of terms in other counties of the circuit is projected upon the theory of the completion of the business of a term in much less than that time. In some of the counties, it requires only a couple of weeks and perhaps not more than a

month in most of them. Special terms are authorized by the statute but not fixed. They have no actuality in law. They are authorized but not created. Looking to the fixed terms of court and the usual, ordinary, regular procedure, the legislature perceived that ordinarily an extension of time would be in such a vacation, and the necessity of enabling the judge to do things in vacation which, without legislative authority, he could not do. In respect to form, the clause is merely an enabling statute. Though extension of time is its prime object, there are no express or formal words of extension. The extension is really effected by necessary implication. Having decided to extend the time, the legislature, without saying it should be extended, proceeded to confer upon the judges power to do acts in vacation which the common law does not authorize and prescribe the method of doing them. Hence it is obvious that the real purpose of inserting the phrase, "in vacation", was not to limit or curtail the extension, but to make clear the intent to confer authority to act in vacation within the thirty days as well as in term. That this incidental thing, this means to an end, was uppermost in the mind of the draughtman, when he wrote the cause, is suggested by a later expression in it, saying "any such exception so made in vacation shall be part of the record and have the same effect as if made in term time." Observe here the absence of words, limiting this reference to the preceding term. The language is indefinite, general, applicable to any term, showing the writer was dealing with the distinction between the judge's powers in term and lack thereof in vacation, and removing, or relieving from, the latter, so the allowance of time, impliedly made, could become available. Pursuing the inquiry further, we note the lack of any direct or express terms, saying the time allowed shall be shortened by the occurrence of a term before the expiration of the thirty days. Failure to mention, or provide for, this contingency may be used as an argument in contention for the view that there was intent to allow it to shorten the time granted, but it is certainly not conclusive. Nor is the form of expression in which authority to sign bills of exception is conferred, saying the court may, in vacation, within thirty days. All the way through, the clause is silent as to what shall result in the event of cessation of the vacation before the

expiration of thirty days. The express terms merely confer power to act in vacation. They go not a step further. They assume the existence of a thirty day vacation, and ordinarily there is one. No other situation was contemplated, provided for, or within the terms of the clause. No statutory authority to act in term time was needed. There was common law authority. The intention to allow thirty days cannot be doubted, though it is not formally expressed. It is necessarily implied, if the vacation lasts that long. Why should it have been given under some circumstances and not under others, for the business of some terms and not for others, for terms followed by long vacations only, and not terms followed by short ones or practically none at all? Nobody can assign a substantial, or even plausible, reason for such discrimination. All that can be said in support of justification of the allowance in the one case applies with equal, if not, indeed, greater, force in the others. Allowance of thirty days, after the expiration of terms for bills of exception, being the primary purpose of the clause, though not formally expressed, and a highly important, indeed, indispensable, function for the phrase, "in vacation", other than that of cutting down or limiting the period, contingently or otherwise, being perceived, we think the rules of construction neither require us to give this phrase any other or further operation or effect, nor would justify us in doing so. The implied grant of thirty days time is just as good and effectual as if it were an express grant. *State* v. *Harden,* 62 W. Va. 313, 315, 351; *Delaplane* v. *Crewshaw,* 15 Grat. 457; *Postmaster General* v. *Early,* 12 Wheat. 136. Carrying the extension into a succeeding term is justified by the plain manifestation of legislative policy to allow a certain period of time for the doing of a certain thing. There was a grant of time. It was not an express grant. It is not expressly limited otherwise than to thirty days. That limit is the only expression, indicating the legislative will as to the extent of the time allowed. The use of the phrase, "in vacation", in connection with it, though necessary in one sense, is merely accidental in so far as it may seem to import intent to reduce the time, on the occurrence of a subsequent term within thirty days. The terms used necessarily carry the intent to grant thirty days, but do not necessarily import in-

tention to cut it down. Some words used could be regarded as indicating intention to reduce the period, but need not be. They are used for another clear, distinct and indispensable purpose, and that satisfies the rule of construction, requiring the court to give effect to all parts of the clause. We are not bound to give it any further effect. Words not expressed are never read into a statute unless they are in some sense necessarily implied. *White* v. *Bailey,* 65 W. Va. 573 (64 S. E. 1019); *United States* v. *Fisher,* 2 Cranch 258 (202); *Jackson* v. *Lewis,* 17 Johns 475; *Turnpike Co.* v. *People,* 9 Barb. 161; *Morgan* v. *Railroad Co.,* 96 U. S. 716. Our attention has been directed to the case of *Hoover* v. *Saunders,* 104 Va. 783, holding that the occurrence of a regular term before the expiration of the thirty day period shortens the time; but we are not satisfied with the process of reasoning adopted by the Virginia Court. As a comparison of this opinion with the one delivered in that case will disclose the differences between views, respecting the meaning of terms and application of the rules of construction, time and labor need not be spent in pointing them out here.

Layne came to his death by a gunshot wound, inflicted by John L. Howery, a special officer, appointed and commissioned by the governor of the state, employed, paid and detailed by the Baldwin Detective Agency for services on the defendant's road. In general, the circumstances of the shooting were as follows: Layne and two of his brothers were passengers on one of the defendant's eastbound trains, on December 23, 1905, having boarded it at Charleston. The decedent's destination was Coalburg, that of one of his brothers, Malden, an intermediate station. Owing to the crowded condition of the train, the latter had had only standing room in the chair car, the last one of the train, while the former occupied a seat in another car. When the train stopped at Malden, the chair-car occupant alighted and started away without having paid his chair car fare. The train porter demanded the fare, telling Layne he would pay it either to him or Howery, who was in a forward car, and at the same time, called Howery. That officer responded to the call, but was informed when he arrived, the fare had then been paid, and the trouble was all over. Immediately afterward, the decedent came up and an altercation occurred between him and Howery,

which culminated in the fatal shooting. There is much contradictory evidence as to how it began, who provoked it, whether the shooting was excusable or justifiable, and nearly all the details. As the issues raised by it were all questions of fact, proper for jury determination only, and are not materially involved in the inquiry, allowed by law to us, as to liability of the defendant, time, labor and space will not be consumed here in detailing it. It suffices to say there is ample evidence to sustain the finding of inexcusable or wrongful shooting, though it is denied and contradicted; but liability of the railway company does not necessarily follow. To establish that, other elements must be added.

Excluding, for the present, the relation of passenger and carrier, Howery was *prima facie* a public officer for whose wrongful acts the company was not liable. *McKain* v. *B. & O. R. R. Co.,* 65 W. Va. 233 (64 S. E. 18); *Healey* v. *Lothrop,* 171 Mass. 263; *Tucker* v. *Railway Co.,* 69 N. J. L. 19; *Cordner* v. *Railway Co.,* 72 N. H. 413; *Foster* v. *Railway Co.,* 140 Mich. 689; *Tyson* v. *Bauland Co.,* 186 N. Y. 397; *Smith* v. *Railway Co.,* L. R. 5 C. P. 640. Nevertheless, if he was engaged in some sort of service for the corporation and did a wrongful act in the course of such service, and within the scope of his employment, or by express direction of his employer, the latter is liable. See authorities just cited and *Deck* v. *Balt. & O. R. R. Co.,* 100 Md. 168; *Brill* v. *Eddy,* 115 Mo. 596; *Dickson* v. *Waldron,* 135 Ind. 507; *Sharp* v. *Erie Ry. Co.,* 184 N. Y. 100; *Thomas* v. *Railway Co.,* 14 Ont. L. Rep. 55. When there is no controversy as to the relation the officer bears to the defendant, respecting the wrongful act, the question of liability is clearly one of law for the court. *Healey* v. *Lothrop* and *Tyson* v. *Bauland Co.,* cited. But there is frequently contradictory evidence as to employment, the nature and extent of the service, and other matters, pertaining to the authority or lack of authority in the officer to act on behalf of the defendant, and, in all such cases, the jury must determine whether there is liability or not. *Sharp* v. *Erie Ry. Co.,* cited; *Deck* v. *Railway Co.,* cited. The defendant is not liable merely because it procured the appointment of the officer or pays his salary or does both. *Tyson* v. *Bauland Co.,* cited; *Tolchester &c. Co.* v. *Steinmeier,* 72 Md. 313; *Foster* v. *Rail-*

*way Co.,* cited. From these propositions, it results, as a neces-
sary sequence, that the plaintiff has the burden of showing the
express or implied authority in the officer to perform the injuri-
ous act for and on behalf of the defendant. As such authority
may be express, as by request or direction, or implied, as by em-
ployment of the officer and inclusion of the act, of which the
killing was an incident, within the scope of the service to be
rendered, it is sometimes necessary to seek it in a mass of contra-
dictory oral evidence and inconclusive, but relevant, circum-
stances. These are general principles of the doctrine of *res-
pondeat superior,* not materially altered or varied by the fact
that the servant is also a public officer. This additional circum-
stance simply raises a question as to the capacity in which the
party, holding the two positions at the same time, acted, and
often forms the basis of an hypothesis for jury consideration
which would not otherwise exist.

But the peculiar relations subsisting among the parties, the
decedent, the defendant and the officer, raise an inquiry as to
the applicability of other principles. The decedent was a pas-
senger on the defendant's train, if he did not lose his status as
such by unnecessarily getting off at Malden, and Howery was a
servant of the railway company, charged with duties, respect-
ing that train. The passenger's life, limbs, soundness of body
and peace of mind are priceless to him. The safety of these he
entrusts to the carrier, for the time being, at the invitation of
the latter and for compensation, deemed adequate for reasonable
provision therefor. Hence, the carrier is under a special duty
negatively to abstain from all negligent or wrongful acts, injuri-
ous or dangerous to the passenger, and positively or affirmatively
to do what is reasonably necessary to protect him from injury,
and the care and diligence to be observed is accentuated and
emphasized by the immeasurable value of the thing committed
or entrusted to the carrier. Loss of life, limbs, health and men-
tal peace cannot be compensated in the true sense of the term,
and the duty of a bailee or employe is always heightened by the
value of the thing committed to his custody or subjected to his
action. To say a very high degree of care, on the part of the
carrier, for the safety of passengers, is required, therefore, ac-
cords fully with legal principles, well settled and operative

throughout the vast portion of the great domain of our juris-
prudence. Generally, the courts say the carrier must exercise
that great degree of care, prudence and foresight which a pru-
dent man engaged in the business, as usually conducted, would
employ, that is, such as is reasonably practicable, but not such as
is barely ·possible. 6 Cyc. 592. This general principle covers
many instances of duty, such as the fitness or suitability of the
means of conveyance, competency of servants, and precautions
against injury by fellow passengers and strangers. In none of
these cases is the contract one of guaranty. It does not cover
inevitable accident or that which cannot be foreseen and pre-
vented by reasonable prudence and diligence. Extraordinary
and practically inconceivable occurrences are not within the con-
templation of the parties in the making of the contract, where-
fore injury from them imposes no liability. Viewing the duty
of the carrier as having been imposed by law, we call the cases
arising under this principle negligence cases, but, in the broader
and perhaps truer sense, they involve contractual rights and
duties, and present nothing more than questions as to what the
contracts were and whether they were broken. However this
may be, the carrier undoubtedly owes to the passenger many con-
tractual duties, non-performance of which is not excused by
diligence and good faith, and in respect to which liability fol-
lows failure as certainly and inevitably as a right of recovery
arises on the non-payment of a debt. Is the right of a passenger
to immunity from intentional injury at the hands of the servants
of the carrier within this principle? It seems so.

"The carrier, like any other master carrying on his business
by means of the employment of servants, is liable for the injuries
resulting from the incompetency, negligence, or wrongful acts
of his servants, -irrespective of whether he has used due care
in the employment of such servants, or whether the act is con-
trary to the master's orders, even though it be wilful or malic-
ious." 6 Cyc. 598. "The duty of the carrier to protect the pas-
senger must be discharged by means of his servants engaged in
carrying out the transportation contracted for. Therefore, if
any servant of the carrier, while thus engaged, assault a passen-
ger or otherwise infringe the right of protection to which he is
entitled, the carrier is liable, irrespective of whether the servant

in the thing done was acting for his master or for his own purposes." 6 Cyc. 600. "It has been frequently held that a carrier of passengers is liable for the tortious acts of its servants, even though wilful or malicious, if done within the scope of their employment, this being the generally accepted doctrine upon this question wherever the relation of principal and agent or master and servant exists, and not being peculiar to carriers of passengers. And many of the latest and best considered cases would seem to go further, recognizing a distinct rule as applicable to carriers of passengers, and holding them liable for the wilful and malicious acts of their servants or agents resulting in injuries to passengers, whether done in the time of their employment, or service, or not, if done during the course of the discharge of their duty to their employees which relates to the passengers. The ground upon which the cases which recognize this doctrine proceed is, that the carrier, as part of its contract of carriage, is bound to protect the passenger from all tortious acts of its servants, and that for a breach of this contract, however occasioned, a passenger may recover." 5 A. & E. Enc. L. 541-3. This makes the liability rest, not upon instigation, encouragement, or express or implied authorization of the master, but upon the breach of the carrier's obligation, and the inquiry is, not whether the servant acted as the carrier's agent in inflicting the injury but whether the master has broken his contract for the safe carriage of the passenger. This is the certain import of the decisions of this Court. *Ricketts* v. *Ches. & O. Ry. Co.,* 33 W. Va. 433; *Gillingham* v. *Ohio River R. R. Co.,* 35 W. Va. 588.

While the contract of carriage thus imposes a heavy responsibility upon the carrier, and reduces its defense to a narrow compass, when the action is for personal injuries inflicted by its servant, it is readily apparent and obvious that the passengers owes some duties to the carrier, which he cannot be allowed to omit. In contract law the antecedent failure on the part of one of the parties to perform what it is incumbent upon him to do, ordinarily justifies the other in refusing to perform his part. The doctrine of estoppel often forbids recovery by the plaintiff. In the law of negligence, the contributory negligence of the plaintiff bars recovery. On these principles or some of them,

the courts, in a few instances have refused to allow recovery for personal injury wrought by the servants of the company, because it appeared the plaintiff had provoked the assault upon himself by attacking the servant, indulgence in vulgar and profane language or other misconduct. These decisions do not, as a rule, attempt to specify any particular legal principle as constituting the basis of their rulings. However, they seem to treat the contract of carriage as having been broken by the conduct of the plaintiff, and the subsequent transactions between him and the servants as being purely personal to them and wholly outside of the contract of carriage. Thus, in *Scott* v. *Railroad Co.,* 53 Hun. (N. Y.) 414, it was held error to refuse to charge the jury that if they believed the plaintiff had commenced the altercation between himself and the driver of a car, and, in the course of it, addressed indecent and insulting language to the latter, such as was calculated or likely to produce the assault, the verdict must be for the defendant. The court said the carrier must be responsible even for the wilful act of the employes which resulted in a trespass against the passenger, but that the rule was not applicable when the trespass was brought about by the improper behavior of the passenger; and again that, "The carrier is bound to protect the passenger and the passenger, in order to entitle himself to such protection, is bound to behave himself in a decent and orderly manner." In *Harrison* v. *Fink*, 42 Fed. Rep. 787, the court said: "A passenger cannot claim damages on account of the conductor drawing a pistol on him, and speaking of him as a coward to the other passengers, if the conductor's conduct was provoked and caused by the acts of the passenger." In *Little Miami R. R. Co.* v. *Wetmore*, 19 O. St. 110, the court held the carrier not liable for the striking of a passenger by a baggage master under provocation, the use of threatening and abusive language. In these cases, or some of them, it is said the act of the servant was not within the scope of his authority or employment, wherefore there was no liability upon the carrier, but this reasoning does not extend to, nor take notice of, the obligation resting upon the carrier to protect the passenger from harm. It contracts to carry the passenger safely to his destination. It does not do so. One of its own servants injures him and he is denied recovery because he is guilty of

misconduct. His assault upon, or abuse of, the servant, may obviously excuse the carrier from performance of his contract. It may eject him from its train, but it is difficult to see how this option on its part can excuse the beating of the passenger or the infliction of other injury upon him by way of punishment. This would be setting one wrong against another and would be retaliation, not remedy. *Scott* v. *Railroad Co., Railroad Co.* v. *Wetmore, Favre* v. *Railroad Co.,* 91 Ky. 541, and *Peavy* v. *Railroad Co.,* 81 Ga. 485, are the only cases found so far, in which recovery has been denied on account of mere provocation. The proposition, asserted by them, varies from the general principles of American law, governing the relations subsisting between passenger and carrier. Other cases, directly in point, declare the contrary. *Railroad Co.* v. *Barger,* 80 Md. 23; *Railway Co.* v. *Peacock,* 69 Md. 257; *Steamboat Co.* v. *Brockett,* 121 U. S. 645; *Railway Co.* v. *Fleetwood,* 90 Ga. 23; *Railroad Co.* v. *Flexman,* 103 Ill. 546; *Bryan* v. *Railway Co.,* 63 Ia. 464; *Coggins* v. *Railway Co.,* 18 Ill. App 620; *Railway &c. Co.* v. *Mullen,* 138 Ala. 614; *Railway Co.* v. *Jopes,* 142 U. S. 18. In *Harrison* v. *Fink,* no bodily injury was inflicted. It was an action for damages for the humiliation, incident to abuse and threats on the part of the servant, superinduced by misconduct on the part of the passenger. It seems to us clear that provocation should always be admissible matter in mitigation of the damages, but cannot justify a wrong in a civil action any more than in a criminal prosecution, but this question does not arise and is not decided. Elliott on Railroads, sec. 1638 says: "It is not merely a question of negligence in such cases, nor is it strictly a question depending upon the scope of the servant's particular employment. It is a question of the absolute duty of a railroad company to its passengers as long as that relation subsists, and a breach of that duty on its part whether caused by the wilful act of an employe or not. A carrier is bound to discharge the implied duty, arising out of its contract and imposed by law, that its passengers shall be protected from injury by its servants and shall not be wilfully insulted and harmed by them, and if it commits the discharge of this duty to an employe it may well be held to do so at its peril, notwithstanding the exercise of care on its part in selecting its servants." This text is sustained by

the great weight of authority, and our cases, *Ricketts* v. *Ches. & O. Ry. Co.* and *Gillingham* v. *Ohio River R. R. Co.*, are in perfect accord with it.

This doctrine is subject to one qualification, imposed by a general principle of law. A servant of a carrier, assaulted by a passenger, may use such force in resisting the same as is actually or apparently necessary to successfully repel it, but no more. The servant may rightfully do what his principal could do, if he were present and acting, and the measure of the right and duty of the former is, under these circumstances, the same as that of the latter. Self-defense, made within the limitations prescribed by law, is always permissible and never a violation of law. Hence, it justifies resistance sufficient to repel the assault wherever and upon whomsoever made. *Railroad Co.* v. *Jopes*, 142 U. S. 18. But if the servant of a carrier, assuming to exercise this right, transcends the limits thereof, in respect to an assault made upon him by a passenger, by the use of unnecessary force or violence, his principal is just as clearly liable for the injury done as the servant himself would be for the exercise of such excessive force, when acting in his individual capacity and not as a representative of the carrier. *O'Brien* v. *St. Louis Trans. Co.*, 185 Mo. 263. *Haman* v. *Railroad Co.*, 35 Neb. 74. To the extent of the excessive force and violence exerted, the conduct of the servant is necessarily wilful and without justification. Being unlawful, it imposes liability and that liability falls upon the carrier because of its duty to protect the passenger from injury by its servant.

Having ascertained the legal principles, pertaining to the relation of passenger and carrier, it becomes necessary to determine the legal effect and operation of another factor in the case, namely, Howery's official position as a public officer. By becoming the servant of the defendant company, he did not lose that. He was then both servant and officer, acting sometimes in the one capacity and sometimes in the other. While engaged in the service of the company, he was more than a train or company servant. In respect to the operation of the train, he was, as servant, inferior to the other train servants, taking his orders from them, especially the conductor. As public officer, his powers were much higher and broader than theirs. The conductor of

a train performs very limited public functions and is hardly to be regarded as a public officer at all. Though he performs public functions, by authority of law, they are only such as enable him the more effectually to execute his powers as a railway servant. He is a conservator of the peace, but only "while in charge of" his train. Code chapter 145, section 31. A special officer, such as Howery was, is a conservator of the peace and possesses and may exercise "all the powers and authority" and is entitled "to all the rights, privileges and immunities" vested in or conferred upon regularly elected or appointed constables, and these rights, powers, privileges and immunities extend throughout every county, traversed by the railroad for which he was appointed, in which he has filed copies of his official oath. Statutes, conferring upon railway servants power to conserve the peace, are construed as only enlarging their powers as servants, and as not giving them the status of public officers, *King* v. *Railroad Co.*, 69 Miss. 245; but statutes, authorizing the appointment of special constables, such as Howery was, provide for the creation of public officers, and the appointees have the status of other constables. Then, as Howery was both officer and servant of the defendant, we must apply the principles first stated in this opinion, to determine in what capacity he acted in the transaction between him and the decedent. If he acted as servant, and Layne was a passenger, and the killing was not justifiable, under the law of self-defense, the strict rule, adverted to, applies; but, even though Layne was a passenger, if Howery acted as a public officer, in vindication of public justice, the defendant is not liable. In some cases, the court can say, as matter of law, in which capacity such an officer and servant acted; in others, the question is one for jury determination. *McKain* v. *Balt. & O. R. R. Co.*, cited.

The rejection by the court of several instructions offered by the defendant is complained of. One of these was to find for the defendant. It was, no doubt, asked under the impression that the plaintiff was precluded on one or all of three separate and distinct grounds. (1) That Howery plainly acted as a public officer in killing Layne; (2) that the decedent had precluded recovery by provoking the injury, even though he was a passenger and Howery acted as servant; and (3) that he was

not a passenger, and, even though Howery was a servant of the company, the act, to which the killing was incident, was beyond the scope of his authority as such.

Howery's duties, as defined by a witness for the defendant, were to investigate all claims and robberies, perform any work directed by the agency by which he was employed, keep order on trains, when there, and perform police duty on trains necessary for the protection of passengers. Witnesses for the plaintiff testified to his frequent, almost constant, presence on the trains of the defendant company, and his enforcement of railway rules, relating to the conduct of passengers and his having made arrests on the trains for criminal conduct. He left the car in which he was riding, on the occasion of the shooting, at the instance of the porter, but there is no evidence that he was expressly directed, ordered or requested to arrest, assault or in any way molest, or interfere with, Robert Layne. The witness, R. F. Adkins, who detailed what he saw very minutely says the altercation between the porter and the Laynes had ceased when Howery came up and Robert Layne had walked down the track "two or three steps and was looking up at the passengers on the coach, along up at the windows." That the controversy between the porter and Henry Layne had ceased when Robert Layne and Howery met, is shown by the testimony of John Layne. The cross-examination on this point, perfectly consistent with the evidence in chief, was as follows: "Q. Howery was then walking toward the steps that Robert got off of? A. Yes. Q. And when he met him that conversation you have detailed took place, and Howery struck him? A. Yes. Q. And then where were you and Henry Layne standing at that time? A. Well, I don't know where Henry was, but I was standing right there with Mr. Howery. Q. Henry had gone on up the river? A. I don't know where he had gone. I didn't see him. Q. That was after the altercation about the ticket occurred and Howery had put his gun in his pocket and turned back towards the coach and met your brother and pulled it out again? A. He started up toward the upper end of the coach and then when my brother Robert stepped off on the ground, he pulled the gun out of his pocket again." Andrew Conrad, an eye witness of the fight, makes no mention of Henry or John Layne, in connection with

the encounter between Robert Layne and Howery. Henry Ball says Robert and Howery were in the company of the other Layne boys when the fight occurred. Speaking of them, he said: "I didn't see either one, only later on I saw the other boys." C. E. Berger said that when Howery came up at the call of Hale, the porter, he was informed by the latter that "Everything is all settled" and Henry Layne had walked away before Robert came up. Henry Layne testified as follows: "Well, when I got off the train I got some six or seven steps up besides the car and the porter hallooed, and says, 'Hold on! Give me your ticket!' and I says, 'I have no ticket,' and he says, 'You will pay me or Howery one', and called for Howery. I asked the porter what was the fare and he said fifteen cents and I laid down my bundles and pulled off my gloves with my teeth and paid him fifteen cents, and by that time Howery came up and the porter says, 'It is all settled Mr. Howery, it is all settled,' and he says, 'have you paid your fare,' and I says, 'I have and he says, 'Go on then and attend to your own business,' and I walked off, and I had got around the depot and I heard a shot fired and some one said Howery had shot Robert Layne, and I laid my bundles down and ran back and Howery shot at me and I grabbed the gun and wrenched the gun away from him and ran." Samuel Selby said Howery and all the Layne boys were together when the fight occurred, but makes no mention of the porter nor of the transaction between him and the Laynes. John Penix said Robert and Henry Layne and nobody else were with Howery when he first saw the latter. Neither he nor Selby heard any of the conversation with the porter. There is much evidence, however, that Howery resented Robert Layne's demand of a cash fare receipt for his brother or rather his complaint to Howery of the failure of the porter to give one, and regarded this conduct, on Robert Layne's part, as indicative of an inclination or determination of the latter to make trouble for the defendant's servants in charge of the train, or pick a quarrel with the officer himself. No doubt Layne left the car, under the belief that trouble between Howery and his brother was likely to occur, and for the purpose of rendering the latter assistance, or possibly to join the brother in an assault upon the officer. Testimony was introduced to the effect that, before alighting

66 W. Va.

from the car, he had expressed himself vindictively toward Howery, saying, among other things, he was not afraid of his gun and would demonstrate that he was too cowardly to use it. He did not go off of the company's premises. The altercation between him and Howery and the fatal shooting occurred right by the side of the train. Moreover, on departing from his seat, he left some packages there, containing articles purchased at Charleston, which he was taking home.

We are of the opinion that the capacity in which Howery acted was a question proper to be submitted to the jury under the circumstances disclosed by the evidence. As we have said his employment by the company was established, though it was indirectly procured through the detective agency. As such servant, he customarily enforced or aided in the enforcement of the rules and regulations of the defendant. On the occasion of the killing, he responded quickly and eagerly to the call of the train porter, when it was supposed his services would be needed for the purpose of enforcing payment of chair car fare. The evidence leaves it uncertain and a question for the jury, whether Layne, at the time he was killed, had committed any breach of the peace or done any unlawful act for which he could have been arrested. According to the testimony of the witnesses for the plaintiff, he had not behaved in a riotous or disorderly manner or done any other unlawful act. He had merely asked what was the matter and demanded a receipt for the chair-car fare paid by his brother. Of course this was contradicted by the testimony of witnesses, introduced by the defendant, and the almost ever present question of credibility of witnesses was involved.

Assuming that the decedent was a passenger and that Howery had acted as servant, principles above stated make the defendant liable, notwithstanding the provocation offered by the decedent. Hence, recovery was not necessarily precluded by such provocation. We have already seen that misconduct on the part of a passenger, tending to provoke an assault upon himself by a servant, does not destroy the contract of carriage nor relieve from its obligations. A recalcitrant or abusive passenger retains his status as such, and even though he assault a servant, the latter is not thereby justified in using more force than is neces-

sary to repel it. The evidence tending to show that the killing was done in self defense went to the jury. It was conflicting. That introduced by the plaintiff amply justified a finding in his favor, if the jury believed it, while that introduced by the defendant might have justified a finding for it, if it had produced conviction on the minds of the jury. Hence, it is quite clear the instruction could not have been given on the theory of justification or exoneration by provocation.

If the contract of carriage had, for any reason, been determined, the strict rule of liability in favor of passengers does not apply. This is so obvious as to require no citation of authority to sustain it. Circumstances sometimes render it doubtful as to whether the injured party is a passenger. There are many ways in which one loses his right to be treated as a passenger. "The relation of carrier and passenger having been constituted continues until the journey, expressly or impliedly contracted for, has been concluded, and the passenger has left the carrier's premises; or until a reasonable time has elapsed after arrival at the point of the passenger's destination in which to afford him ample opportunity to depart from the carrier's premises, unless the passenger has relinquished his rights as such by some act or misconduct of his own, such as a refusal to pay fare, refusal to produce a ticket, failure to have his ticket stamped, detaching coupons, attempting to use an invalid ticket, or refusing to comply with the reasonable rules of the carrier." 5 A. & E. Enc. Law 497. A passenger does not, however, lose his status as such by merely alighting at a regular station for exercise, for lunch or for any business not inconsistent with the pursuit of the journey contracted for. *Parsons* v. *Railroad Co.,* 113 N. Y. 355; *State* v. *Railroad Co.,* 58 Me. 176; *Dice* v. *Transportation Co.,* 8 Ore. 60; *Packet Co.* v. *True,* 88 Ill. 608; *Railroad Co.* v. *Foreman,* 73 Tex. 311; *Dodge* v. *Steamship Co.,* 148 Mass. 207; *Railroad Co.* v. *Shean,* 18 Col. 368; *Railroad Co.* v. *Riley,* 39 Ind. 568. It has been held, however, that if a train merely stops to allow other trains to pass, and a passenger leaves it without objection made or notice given, he surrenders his place as a passenger for the time being, although he does no illegal act. *State* v. *Railroad Co.,* 58 Me. 176; *DeKay* v. *Railroad Co.,* 41 Minn. 178. Perhaps these

cases mean no more than that the passenger, under such circumstances, is guilty of the negligence which causes his injury. They are cases in which the injuries were not inflicted by affirmative or wilful acts of servants of the company. The failure of duty, charged against the carriers, related to means of egress and ingress, and failure to give due notice of the starting of the trains from which the passengers had temporarily alighted. In other words, they seem to be pure negligence cases, the liability depending upon questions of negligence on the part of the carriers and contributory negligence on the part of the passengers. Other similar decisions are *Finnegan* v *Chicago &c. Ry. Co.,* 48 Minn. 378; *Buckley* v. *Old Colony Ry. Co.,* 161 Mass. 26; *Allerton* v. *Boston &c. Ry. Co.,* 146 Mass. 241; *Cincinnati &c. R. Co.* v. *Carper,* 112 Ind. 26; *Drew* v. *Central &c. R. Co.,* 51 Mass. 425; *Knight* v. *Portland, &c. R. Co.,* 56 Me. 234; *King* v. *Central R. Co. of Ga.,* 107 Ga. 754; *Abbott* v. *Oregon &c. R. Co.,* 46 Ore. 549; *Hendricks* v. *Chicago &c. R. Co.,* 136 Mo. 548; *Chicago &c R. Co.* v *Sattler,* 57 L. R. A. 890; and *Conroy* v. *Chicago &c. R. Co,* 38 L. R. A. 419. The last two of these are specially relied upon in the brief for plaintiff in error, but they do not sustain its position. In the *Sattler Case,* the court held the plaintiff's decedent not to have been a passenger within the meaning of a certain statute. In the other, recovery was denied on the ground of contributory negligence, and the court held the carrier bound to only ordinary care, under the peculiar circumstances, but it distinctly declared the relation of carrier and passenger had not ceased. It was a case of injury by an explosion of a burning oil tank, which the plaintiff, leaving a temporary station, had approached from motives of curiosity or pleasure.

Instructions Nos. 2, 3, 9 and 11, requested by the defendant, were all properly rejected. They pertain to Howery's status as a public officer, their object being to tell the jury that, if they should find from the evidence he was such an officer at the time of the shooting, there was no liability upon the defendant for his act, or that he was presumed to have acted as a public officer and not as a servant. Nos. 2, 9 and 11 propounded the first of these theories and No. 3 the second. That Howery was a public officer at the time of the killing was not, as we have shown,

any defense. It was only a fact which cast upon the plaintiff the burden of proving the additional fact of servantcy. *Prima facie* an officer is not a servant. If the plaintiff would fix liability upon another for his act, he must prove the relation of master and servant. That he was a public officer is beyond question, but it does not follow that he was not also a servant nor that he acted as a public officer and not as a servant in the transaction to which the killing was incident. The real issue was whether Howery acted on behalf of the company or the public in the transaction between himself and Layne in which the latter was incidentally killed. At the time of this transaction he was both officer and servant, and, in general, acting as such. The jury question was the capacity in which he acted in that particular transaction. None of these instructions propounded that question. Each of them would have tended to becloud the issue and mislead the jury. Instruction No. 3 was intended to tell the jury that Howery, in endeavoring to arrest Layne, must be presumed to have acted in his official capacity, notwithstanding they may have found that he had been before that time a servant of the defendant. This instruction was calculated to mislead in this, that it ignored the theory of servantcy on the part of Howery at the time of the killing. It also assumes that he was endeavoring to arrest Layne at the time. Whether he was endeavoring to do so was an open question, to say the least of it. Instruction No. 8 was properly rejected. It would have told the jury that, under the evidence in the case, Layne was not a passenger at the time of the altercation which resulted in his death. What has already been said makes this obvious. Instructions Nos. 5 and 6 were so framed as to tell the jury the plaintiff could not recover, if they should find Layne had left the car for the purpose of engaging in a quarrel with Howery or assaulting him, and was killed in an altercation so brought about. The court refused, but modified them so as to say he could not recover, if Layne left the train for the purpose of unlawfully or improperly engaging in such altercation. Enough has been said on this subject to show that the court did not err in rejecting these instructions in the form in which they were prepared. Their propriety, as modified and given, is not questioned, wherefore we are not

called upon to say whether it was proper to give them as modified.

Instructions Nos. 4 and 10 were intended, respectively, to submit the following propositions: (1) If the jury should find that Howery committed the assault upon Layne at a time when he was acting for himself and as his own master, the defendant was not liable; and (2) if Howery, although found to be a servant of the defendant at the time of the killing, acted beyond the scope of his duties as such servant, the defendant was not liable. The first of these was properly rejected. It would have been misleading. If Howery, while a servant, acted for himself, or rather for purposes of his own in assaulting a passenger, the company would be nevertheless liable. If the instruction had been so framed as to submit to the jury the question, whether Howery was acting for and on behalf of the defendant company, and not in his capacity as a public officer, it would have been free from this objection. As prepared, it was too narrow, leaving it open to the jury to say that, even though he was, as a servant, enforcing a rule and regulation of the master, he could have assaulted Layne by way of revenge for some insult or out of vindictiveness without making the defendant company liable. For the same reason, the court properly rejected instruction No. 10. It would have directed the jury to inquire only as to whether the killing was within the scope of the servant's duty. The killing was only an incident of what transpired. Unless done in self-defense, it was necessarily beyond the scope of the duty of any servant and wholly unjustifiable. The court should have directed the jury to inquire as to the capacity in which Howery was acting when he inflicted the mortal wound. This instruction would have been palpably misleading.

Objection is made to the giving of plaintiff's instruction No. 1, but no fault in it is pointed out in any of the assignments of error. Our examination of it reveals none.

Evidence tending to show the election and qualification of Howery as a regular constable of Kanawha county was offered and rejected, and this ruling of the court is complained of. This, no doubt, was proper evidence, but the defendant was not prejudiced or injured by the rejection thereof, for the reason

that Howery's status as a public police officer was otherwise established.

On cross-examination, the attorney for the defendant asked what office, if any, Howery filled or occupied in Kanawha county at the time of the shooting. The objection to this was properly sustained. It was evidence in chief, for which the witness should have been called by the defendant, if it desired to prove the fact by him. *State* v. *Carr,* 65 W. Va. 81 (63 S. E. 766). Besides, there is no intimation as to what the witness would have said in response to the question.

The court overruled an objection made to the following question propounded to plaintiff's witness in reference to Howery: "Don't you know he had been police officer for the Chesapeake & Ohio Railway Co. since that time?" The subject matter was proper. The witness testified that he had frequently seen Howery ride on the trains of the defendant, both passenger and freight, and make arrests on local freight trains, before the killing of Layne. These were circumstances tending to show Howery's connection with the defendant in a special capacity. The question was objectionable in form, but the court had discretion to allow it, in view of evasion and reluctance on the part of the witness. *State* v. *Carr,* cited.

The petition for a writ of error contains an assignment of error relating to the testimony in chief of the witness Sam Selby, introduced by the plaintiff, but the record shows no objection, ruling or exception relating thereto. On cross-examination the defendant propounded to the same witness several questions, for the purpose of proving by him that Howery was a constable of Kanawha county, to all of which objections were sustained. This is evidence that ought to have been introduced, if competent, by calling the witness to testify on behalf of the defendant.

The witness, John Layne, was permitted to say, over the objection of the defendant, that he did not resume his journey on the train after having gotten off at Malden, because "They (meaning somebody connected with the train) hit me with blackjacks and run me from the train." This ruling of the court was excepted to, and afterwards there was a motion to exclude the evidence, which the court overruled, but it directed the jury

not to regard the statment of the witness, that he was driven from the train, nor any violence inflicted on him, in arriving at their verdict or in the trial of the issue, except as a reason why the witness did not pursue his journey. If the evidence was improper, this instruction to the jury rendered it utterly harmless.

Perceiving no error in the judgment, we affirm it.

*Affirmed.*