BUMAN v. MICHIGAN CENTRAL RAILROAD CO.

1. CARRIERS—PASSENGERS—RAILROADS.
   The relation of passenger and carrier did not exist between a railroad company and one who, intending to purchase a ticket, alighted from an interurban car of another corporation, proceeded several blocks towards defendant's station where he paused outside, gave money to an employé of defendant, not the ticket agent, and requested him to purchase a ticket, when the intending passenger was arrested for being drunk and disorderly, and engaged in a quarrel with the police officer.[1]

2. ARREST—RESISTING OFFICER—EVIDENCE.
   Upon undisputed testimony that plaintiff used foul language to and assaulted an officer, that the officer in the course of the affray repeatedly stated he was trying to arrest the man and called for help, that he told plaintiff several times he wanted to arrest him, told him to come on, and that he requested others to assist in arresting plaintiff, the court should have charged, as a matter of law, that plaintiff was under arrest, and the question should not have been submitted to the jury.

3. MASTER AND SERVANT—PERSONAL INJURIES—RAILROADS.
   Defendant, a railroad corporation, was not liable to plaintiff for an alleged assault made upon him by an employé of defendant who was also a police officer and who went to the assistance of a policeman that requested aid in arresting plaintiff for disorderly conduct and drunkenness.[2]

4. SAME.
   When a police officer arrests a disorderly person it is presumed that he is acting in his official capacity and not as agent for his employer.

Error to Cass; Des Voignes, J.   Submitted December 14, 1911.   (Docket No. 130.)   Decided March 12, 1912.

[1] As to when person who has started for a train becomes a passenger, see note in 24 L. R. A. 521.
[2] Liability of carrier for wrongful arrest of passenger by servant, see note in 7 L. R. A. (N. S.) 162.

Case by Charles O. Buman against the Michigan Central Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed, and no new trial granted.

*Gore & Harvey*, for appellant.

*Charles E. Sweet* and *Wilbur N. Burns*, for appellee.

STEERE, J. This action was brought to recover damages for personal injuries alleged to have been inflicted upon plaintiff on the night of August 4, 1910, by John Bachman, an officer and night watchman in the employ of defendant at its station in the city of Niles, Mich.

Bachman was a duly elected constable of the city of Niles and police officer, but without pay from the city. As such officer he had authority to make arrests. He was 40 years of age, and had been in the employ of the defendant for several years. On the evening of August 4, 1910, plaintiff arrived in the city of Niles at about 11:30 on an interurban car from South Bend, Ind. He testifies that he was changing his location from Mishawaka, Ind., where he had been working, to Dowagiac, Mich., where employment was awaiting him, and it was his intention to take the east-bound Michigan Central train, scheduled to pass Niles soon after his arrival on the interurban. The time of the train's passing was 12:26 a. m. From where he left the interurban car to the Michigan Central station is about half a mile, and he proceeded to walk the distance, carrying two suit cases; one containing tools and the other his clothing. The route included a viaduct crossing over the Michigan Central tracks in the vicinity of its station. He stopped on the viaduct to rest, as he testified. William Metcalf, a police officer of the city of Niles, being on duty and in uniform, passed down the street to go over the viaduct to the station, making the rounds on his beat, timing himself to be there when the train arrived. Approaching the viaduct, he saw plaintiff standing on the bridge, and, turning his light upon him,

discovered, as Metcalf testified, that plaintiff was committing a nuisance on the walk. Both parties testified that the officer called to the plaintiff and asked him what he was doing, and was told that it was none of his business. The officer testified that words were exchanged, and plaintiff soon picked up his grips and started for the station; that after being gone a short time he returned without his grips and proceeded to upbraid the officer for making him lose his cigar, using abusive language and threatening to throw him over the railing; that words followed, and, plaintiff persisting in his abuse and threats, the officer told him he would lock him up, and took hold of him; that plaintiff resisted and fought, and was proving too much for the officer, who was lame and a man 62 years of age, when two men from the station, whose attention was attracted by the loud words, came up and assisted. Plaintiff then jerked away and went towards the station; the officer and two men also going towards the station behind him.

Plaintiff's version of what occurred on the viaduct and at the station is as follows:

"I came to the depot side of the city viaduct and set my suit cases down for a rest. I was accosted from the back by some man that put a light on me and wanted to know where I was going.

"Q. Could you see the man?

"A. I could not.

"Q. What did you tell him?

"A. I told him I was on my way to Dowagiac.

"Q. What did he say then?

"A. I don't remember definitely; but I think he wanted to know what I was doing there. * * * I told him I didn't think that was any of his business, and he wanted— He says, 'If you are going to Dowagiac,' he said, 'you better be moving on.' I told him I didn't think I had to; but I hadn't said that much yet until he struck me, knocked me down.

"Q. Where did that blow hit you, do you remember?

"A. I don't just exactly remember whereabouts; but it was some place on the head. * * * As soon as I was knocked down, I got to my feet as soon as I could, picked

my suit cases up, and started for the depot, when it came to me who that fellow might be.   *   *   *   I walked back on to the viaduct.

"*Q.* Left your suit cases down there ?

"*A.* Yes, sir.   *   *   *   There I saw some fellow on top of the viaduct; but I didn't know it was the same man.   I accosted him with a question, if I recollect rightly, as to what time that train left for Dowagiac, and the language that he answered me in I took it for granted it was the same man that had accosted me before,   *   *   * from the way he answered me; we had words there.   He undertook to strike me again, and I resisted and foiled his first attempt; but when he struck the second time he struck me, dazed me, staggered me.   *   *   *   From the way it felt, it was a club.   *   *   *   As soon as I got my balance again, got my feet, I noticed, I think, three other fellows coming up from the depot side; I started on for the depot.   I walked down to my suit cases, and these fellows followed me up.   I reached my suit cases and picked them up and started for the depot.   As I reached the depot, there was some parties standing on the outside; I didn't know who they were.   I went up to those parties and told them where I was going and when I wanted to go, and gave them some money."

It appears from other testimony that at the station he handed a piece of silver money to the baggageman and told him to get him a ticket for Dowagiac, and then turned on the policeman and men who were with him.   He testified:

"I turned to say something to these fellows that had been following me, but don't recollect what it was, and don't know as I said it, and one of them knocked me down, and struck me such a blow on the head as to fall me, and as soon as I hit the walk one of those parties jumped on my head and sat there and told me something; but what he told me I don't know.   Finally he got off my head, and I got to my feet, and I thought I was going to my suit cases again; but when I would rub my head and come to, I was out in the middle of the street."

All the other witnesses testified that plaintiff assaulted the policeman, using the vilest epithets towards him.   The evidence is undisputed that the officer attempted to arrest

him; that he resisted arrest most vigorously and for a time successfully. Metcalf, the officer, directed somebody to get Bachman, the watchman, who was inside fixing an electric light and knew nothing of all this trouble up to that time. Backman responded to the call, and at Metcalf's request proceeded to assist him in making the arrest, which was yet being actively resisted. In the struggle, plaintiff got inside of the station and clung to the railing for a time, from which he was detached with difficulty. He was finally overcome, hand-cuffed, and taken to the lockup, where he was delivered to the turnkey. That officer testified that he made no complaint of being injured, and went to sleep on the bunk in his cell, sleeping soundly.

The next morning he was taken by the city marshal before a magistrate, where he was charged, on complaint made by Policeman Metcalf, with resisting an officer, using obscene language, and drunkenness. The city marshal testified that when asked what his name was he said it was Charles Dooling, in which name the complaint was made against him, and that he pleaded guilty. Plaintiff testifies:

" He had three charges against me.

"*Q.* Do you know what they were?

"*A.* Being drunk, I think they were, and resisting an officer, and using indecent language.

"*Q.* What did you tell him about it?

"*A.* He wanted to know if I was guilty or not guilty. I told him I would not say; I could tell him better how it happened.

"*Q.* Did you tell him then what happened?

"*A.* I related to him as near as I could what had happened on the night before.

"*Q.* What did he say?

"*A.* He found me guilty and imposed a fine of one dollar and costs, and gave me 15 days to go on to Dowagiac and earn the money and make remittance to him."

It is denied by plaintiff that he was intoxicated on that evening. He testified that he had taken possibly three or

four glasses of beer during the evening up until 11 o'clock, but that he was sober. A witness who was on the car from South Bend with him corroborates his claim. The officers and other witnesses testify that he was intoxicated. Two of the witnesses to the trouble which occurred at the station after Bachman was called testified that Bachman struck the plaintiff on the head with his club twice or more. Six witnesses to that transaction testified that he did not do so.

Whether plaintiff was intoxicated or not, whether more violence was used by the officers than was reasonably necessary to subdue plaintiff and effect his arrest, whether he was injured by them, and, if so, to what extent, are all facts in dispute, which, if defendant railway company was liable for the conduct of Bachman, would be issues of fact for a jury. But back of those issues we have the vital question of whether or not there are any facts in this case which might make defendant liable for Bachman's conduct.

In charging the jury, the court correctly stated this rule of law:

"An officer in the discharge of his duty may call others to his assistance, if deemed necessary by him to do so. So in this case, if you find that Officer Metcalf had placed the plaintiff under arrest, and sent for John Bachman afterwards to assist him in detaining the plaintiff and taking him to the lockup, then Bachman acted in his capacity as a peace officer of the State, and the defendant is entitled to your verdict of no cause of action."

It is the claim of the defense that there is no issue of fact upon that proposition, and it should have been disposed of by the court as a question of law. It is the claim of the plaintiff that the testimony is in conflict in that particular, and it was for the jury to determine. An examination of the record shows that all witnesses to the trouble which occurred outside the station, prior to the time Bachman was called, testify positively, or in substance, that the police officer, Metcalf, was then trying to arrest

plaintiff, who was fighting with and resisting him. Plaintiff nowhere in his testimony denied this, though he claimed the officer first assaulted him.

Plaintiff's counsel rely on the testimony of the witness Whetstone as raising an issue of fact upon that question. Whetstone's testimony shows that he did not arrive on the scene until Bachman was called. According to the testimony of all the witnesses on both sides, who were then present at the time Metcalf sent for Bachman to aid him, plaintiff was resisting and fighting the officer. The witness Whetstone testifies:

"The man [plaintiff] just got up just as I got there. When I saw him, he was just getting up. I suppose he was lying down; I supposed he was. When he got up, there was a number of fellows right near him. Metcalf was one. I could not tell you whether Metcalf had hold of him; but I know he had hold of him when I turned round. When Bachman got hold of him, they both got hold of him. Mr. Bachman appeared there just as I appeared; I didn't know where he came from. * * * There was a good deal of talk going on there. * * * The officers took hold of this man, * * * one on one side and one on the other. * * * It appeared to me that these two men were trying to take him down town. I testify to that fact, because it so appeared to me at the time. * * * The plaintiff here was trying to go into the depot, using his strength to go that way. The plaintiff pulled them both into the station, * * * and the officers were trying to hold him, Mr. Metcalf and Mr. Bachman. * * * I think the officers were saying to him, 'Come on now.' * * * He was not coming on; he was going the other way. * * *"

This witness manifestly cannot testify to anything which occurred before he and Bachman arrived on the scene. All witnesses agree that plaintiff resisted and fought Metcalf, an officer in uniform and wearing his star. There could be no mistake at the station as to the official character of the man with whom plaintiff was having the trouble.

Error is alleged on the refusal of the court to give defendant's request No. 4, which is as follows:

"I charge you that the plaintiff was not a passenger to whom the defendant, as carrier, owed any duty. To constitute the relation of carrier and passenger, the individual must present himself or herself to the carrier in a proper manner, at a proper place, and in a proper condition, and the relation of carrier and passenger will not attach until the carrier has accepted such individual as a passenger by selling them a ticket, or conducting them to a train, or permitting them to board a train, or do some act or acts which indicate an acceptance by the carrier of such individual as a passenger."

The relation of carrier and passenger did not exist between plaintiff and defendant. Undoubtedly plaintiff intended to become a passenger of defendant, and would have done so, were it not for the trouble he had with the policeman, Metcalf, on the viaduct and outside of the station. When he arrived outside the station, and without entering it, he set down his suit cases, handed 50 cents to the night baggageman, and turned upon the officer with whom he had previously had trouble. Plaintiff testifies:

"As I reached the depot, there was some parties standing on the outside; I didn't know who they were. I went up to these parties and told them where I was going and when I wanted to go, and gave them some money."

There is also testimony to the effect that while he was having trouble with the officer he called for a ticket, saying that he had given his money to the ticket agent, and rushed, with the officers holding onto him, into the station, grabbing hold of the brasswork in front of the ticket office. He was not sold a ticket nor accepted as a passenger.

At the conclusion of the testimony, defendant's counsel requested the court to direct a verdict, and presented, among others, the following request:

"It is uncontradicted that Officer Metcalf, having placed the plaintiff under arrest, sent for John Bachman, called 'Humpy,' to assist him in detaining the plaintiff and taking him to the lockup. This being so, I instruct

you, as a matter of law, that John Bachman thereafter acted in his capacity as a peace officer of the State, and the defendant is not liable for his conduct as such officer. For such conduct, he is liable to the State alone. The undisputed evidence is that Bachman first rendered assistance to Police Officer Metcalf outside of the station building, and there assisted Officer Metcalf in detaining the plaintiff; that plaintiff resisted both of the officers and escaped from Officer Metcalf, and pulled Officer Bachman into the station with him; that in holding onto the plaintiff and doing what Officer Bachman did to subdue him and make him submit to authority, he did in his official capacity as a peace officer, and for such conduct the defendant railroad company is not liable."

This request was refused, and the case submitted to the jury. A verdict was rendered against the defendant for $5,000.

In his reasons for denying a motion for a new trial, the court said:

"Again, I am compelled to say that the claimed arrest was disputed by plaintiff, the witness Whetstone, and the testimony of the young boys, leaving the matter one of conflict. Certainly the court could not, under the circumstances, say that on this issue it was undisputed, and it became a question for the jury. Our Supreme Court have been quite particular in holding that if there is a scintilla of evidence upon the question it must be left for the jury. * * * The crux of the case, in my opinion, is, 'Was plaintiff under arrest by Officer Metcalf when Bachman was called?' Upon that issue, there was conflict in the testimony; it may be said to be slight, but for that the court would have directed a verdict, * * * and to that end the court clearly and positively instructed the jury that plaintiff could not recover if Buman was under arrest by Officer Metcalf at the time Bachman was called to assist, and if they so found, under the evidence, they need consider the case no further, but return a verdict for the defendant."

From a careful examination of the printed record, we are unable to discover that there was any evidence to go to the jury upon the question of Metcalf having placed plaintiff under arrest at the time Bachman was called.

We have already discussed the testimony of witness Whetstone. Plaintiff, whose testimony is confusing and peculiar, does not deny being arrested at the time in question. Aside from the plaintiff and the policeman, who testified positively that he had made the arrest, there were four witnesses to what occurred outside the station before Whetstone and Bachman arrived—Stebbins, Fowler, Beckwith, and Curtiss. Stebbins, after testifying to the foul language used and assault made by plaintiff, says:

"Mr. Metcalf wanted to put him under arrest; he called for help, because the man was resisting him. * * * Mr. Metcalf says, 'I am trying to put this man under arrest.' * * * I could not say how many times Metcalf told him he was under arrest—all of a dozen."

Fowler testifies:

"Buman backed away from him [Metcalf] a little, and then started at him again. Mr. Metcalf says: 'Hold him there. Hold him.' * * * Mr. Metcalf says: 'Let him up. I want to arrest him.' We let him up, and he started for Metcalf again."

On cross-examination, witness, after repeating that Metcalf said, "Hold him," testifies, in the meantime, Metcalf tried to arrest him. Beckwith, the man who was sent after Bachman, tells of the assault and foul language used by plaintiff, of the others interfering to assist the officer and throwing plaintiff down, and testifies:

"* * * Then he [Metcalf] says: 'Let him up. I will take care of him.' And he got up * * * and came back at Metcalf as hard as he could for the start he had, and Metcalf says, 'Get Humpy.' So I went into the station. Mr. Metcalf, to my knowledge, stayed out with Stebbins, holding the man."

Witness Curtiss testifies, among other things:

"Mr. Metcalf says: 'Let him up. I want to arrest him.'"

It should not have been left to the jury to decide, as an

issue of fact, whether Metcalf was arresting plaintiff at the time he sent for Bachman.

It is the undisputed testimony (except plaintiff's statement that he doesn't think so) that when plaintiff arrived outside the station he set down his grips, and, turning on the policeman, made use of most profane, vile, and obscene language. The court very properly charged the jury that the language it was claimed plaintiff used "was of such a type and of such character that an officer would be justified in making the arrest of any person using such language in a public place."

That the policman, Metcalf, as a public officer, while having trouble with and trying to arrest plaintiff, sent for Bachman to help him to do so, is clearly shown. Bachman only went in response to such call. He knew nothing of any trouble before. His action was initiated entirely by a call from the policeman to help him. It was not in obedience to the directions of an officer of the defendant or any call of duty, as its watchman, to protect the property or passengers of his employer. Had Bachman gone at the call of an official of the company, or on his own initiative in the line of his duties as watchman, a different question would arise.

It is urged by counsel for plaintiff that the question of whether Bachman was acting as a servant of the defendant in the line of his employment, or as a public officer, is a question for the jury, although the facts be undisputed; and in support of that contention many cases are cited; the principal ones upon which counsel rely being *Sharp* v. *Railroad Co.*, 184 N. Y. 100 (76 N. E. 923, 6 Am. & Eng. Ann. Cas. 250); *Deck* v. *Railroad Co.*, 100 Md. 168 (59 Atl. 650, 108 Am. St. Rep. 399); *Illinois Steel Co.* v. *Novak*, 184 Ill. 501 (56 N. E. 966); *Duggan* v. *Railroad Co.*, 159 Pa. 248 (28 Atl. 182, 186, 39 Am. St. Rep. 672); *Layne* v. *Railway Co.*, 66 W. Va. 607 (67 S. E. 1103); *Rand* v. *Railway Co.*, 40 Mont. 398 (107 Pac. 87).

These cases and many more are authority for the rule

that on a certain class of undisputed facts, from which different men might reasonably draw different inferences, the jury shall determine in which capacity a given act was performed. But in all such cases the alleged offender, while exercising the functions of public officer and private employé, committed the violence complained of, not at the instigation of a third party, as in the case at bar, but by the direction of his employer or some one representing him, or on his own initiative in the belief that he was protecting his employer's interests and furthering his welfare.

The present cause is in marked distinction in that particular, and involves a different principle. The act of Bachman did not grow out of any authority conferred on him by defendant, because the plaintiff was not, to Bachman's knowledge at the time he was called, invading or offending against the railroad company's rights in any particular. The occurrences between Metcalf and plaintiff were as much an outside matter as if they had occurred away from the railroad company's grounds, in the fact that Bachman was called to leave the duties of his employer, in which he was at the time engaged, to respond as a peace officer to a call for help from an outsider. The master is not liable for the acts of his servant in assisting a third person. *Olive* v. *Whitney Marble Co.*, 103 N. Y. 292 (8 N. E. 552); *Murphey* v. *Caralli*, 3 Hurl. & Colt. 462; *Stone* v. *Hills*, 45 Conn. 44.

In *Foster* v. *Railway Co.*, 140 Mich. 689 (104 N. W. 380), it was said of men in private employ who also were appointed or elected police officers:

" When acting purely in their capacity as police officers, the defendant is not responsible for their acts. Only when the defendant, through its authorized agent, has employed or directed such police officers to act for it, does it become responsible. * * * If this police officer acted, in his alleged attack upon the plaintiff, solely in his capacity as an officer, and not by and under the direction of the conductor of the car, the defendant is not responsible for his act.

" When a disorderly person is arrested by a police offi-

cer, the presumption is that the officer is acting in an official capacity, and not as an agent for the party who by law is required to pay him. *Jardine* v. *Cornell*, 50 N. J. Law, 485 (14 Atl. 590)."

And to like effect are *Tucker* v. *Railway Co.*, 69 N. J. Law, 19 (54 Atl. 557); *Healey* v. *Lathrop*, 171 Mass. 263 (50 N. E. 540); *Cordner* v. *Railroad*, 72 N. H. 413 (57 Atl. 234); *Tyson* v. *Bauland Co.*, 186 N. Y. 397 (79 N. E. 3, 9 L. R. A. [N. S.] 267).

This affray, in which it is alleged plaintiff sustained actionable injuries, was primarily Metcalf's, not defendant's. Metcalf, in the line of his official duty, effected the arrest of plaintiff, locked him up overnight, and made complaint against him the next morning for an offense of which he was convicted. At the time of the arrest, Metcalf was on duty, in the service of the city, as a peace officer patrolling his beat. Defendant was not concerned with, and cannot be held responsible for, any injuries inflicted on plaintiff by such city policeman or those summoned by him to his aid, even though one of them, being a peace officer, happened to be in defendant's employ as a watchman. The rule of *respondeat superior* does not apply where the servant is only responding to a call for assistance by a third party.

The judgment is reversed, and no new trial granted.

Moore, C. J., and Brooke, Stone, and Ostrander, JJ., concurred.