CLARENCE NEALLUS *vs.* HUTCHINSON AMUSEMENT COMPANY

Cumberland.   Opinion December 22, 1927

*A police officer, whose appointment is secured by and whose services are paid by a person or corporation, acts sometimes as an officer and sometimes as a servant of such person or corporation.*

*Whether in a particular case the doer of the act complained of was at the time acting in his official capacity or within the scope of his employment as a servant or employee is ordinarily a question of fact for the jury.*

In the instant case, if, at the time of the asault, the officer was making an arrest for the commission of a crime, he was acting as a police officer and the defendant would not be responsible although he used excessive force in so doing.   If he was not so acting but was discharging his duties of protecting the business of the defendant and of maintaining order upon the premises and did so in a negligent or wanton manner the defendant was liable.

On exceptions and motion.   An action of tort against the proprietor of a moving picture theatre by a patron for an alleged assault upon him by a special police officer claimed by the plaintiff to have been an employee of the defendant at the time of the assault.

To a refusal to direct a verdict for defendant exceptions were taken and after a verdict for plaintiff was rendered a general motion for a new trial was filed.   Exceptions and motion overruled.

The case is sufficiently stated in the opinion.

*John J. Devine*, for plaintiff.

*Herbert J. Welch and Edward J. Harrigan*, for defendant.

SITTING: WILSON, C. J., PHILBROOK, DUNN, STURGIS, BASSETT, JJ., MORRILL, A. R. J.

BASSETT, J.   Case against the proprietor of a moving picture theatre by a patron for an alleged assault upon him by a special police

officer alleged to be an employee of the defendant. Plea general issue with brief statement that the officer was in the act of placing the plaintiff under arrest and, being assaulted by him, used only the force necessary for self defence.

At the close of the evidence a motion by the defendant for a directed verdict was denied. Verdict of $110 for the plaintiff. The case comes up on exceptions to the refusal to direct a verdict and upon general motion for new trial.

The fundamental question of the case is whether there was evidence which would warrant a finding that one Benson, who was appointed a special policeman at the defendant's theatre at its request and whose services were paid by it, was acting as its agent or employee at the time of the alleged assault.

To answer this question we must first determine, and it has not been hitherto by this court, what is the status of such a police officer and to what extent is the person or corporation, who so secures his appointment and pays for his services, liable for his acts.

The decisions hold generally that such officers act sometimes as officers and sometimes as servants of the person employing them; that they are not, although paid for all their services by the persons at whose instance they are appointed, servants of such persons in respect to all the acts they perform by virtue of their offices but only in respect to services rendered to those persons, such as protecting and preserving their property or maintaining order on their premises; that the line of distinction, sometimes hard to recognize under the circumstances of a given case, marks the point at which the act ceases to be one of service to the employer and becomes one of vindication of public right and justice, of the apprehension or punishment of a wrong doer, not for the injury done to the employer but to the public at large; that to make the employer liable he must have directed the injurious and wrongful act to be done, not necessarily in express terms but by implied authority or direction from him to the officer to do the act; in other words, if the act done was within the scope of the duty imposed upon the officer by his contract of service in favor of the employer, the employer is responsible. *Mc Kain* v. *Baltimore, etc., R. R. Co.* 65 W. Va. 233 (1909); 64 S. E. 18; 131 A. S. R. 964; 17 Ann. Cas. 634 and note; 23 L. R. A. (N. S.) 289 and note. *Layne* v. *Chesapeake & O. Ry. Co.* 66 W. Va. 607 (1910); 67 S. E.

1103;  30 L. R. A. (N. S.) 483 note.   *Deck* v. *Baltimore & O. R. R. Co.* 100 Md. 168 (1905) 108 A. S. R. 394; 59 Atl. 650;  *Foster* v. *Grand Rapids Ry. Co.* 140 Mich. 689 (1905);  104 N. W. 380.   *Dickson* v. *Waldron* 135 Ind. 507 (1893);  34 N. E. 483;  35 N. E. 1;  24 L. R. A. 483;  41 A. S. R. 440.   *Taylor* v. *New York & L. B. R. Co.* 80 N. J. L. 282 (1910);  78 A. 169;  39 L. R. A. (N. S.) 122;  *Rice* v. *Harrington* 38 R. I. 47 (1915);  94 A. 736.

"The weight of modern opinion is that where private persons, with the consent of the state, employ its police officers to represent them, and to do special work for them in protecting and preserving their property and maintaining order on their premises, and such officers are engaged in the performance of their duties to their employers and are acting within the scope of their powers and duties, they become and are the servants and employees of such private persons and for negligent and wanton acts committed by them in the line of their duty, and when engaged in the performance of such duties, to the injury of others, their masters or employers are liable."   18 R. C. L. Sec. 246, p. 786;  Ann. Cas. 1913 D 112 note;  *Kusnir* v. *Pressed Steel Car Co.*, 201 Fed. 146, 150, (1913).

The fact of being a police officer does not prevent his being employed.   *Hirst* v. *Fitchburg & L. St. Ry.*, 196 Mass. 354 (1907).

A peace officer may undertake to act in a capacity which in law constitutes civil agency, endeavoring to aid an aggrieved or molested citizen in obtaining or defending his rights and in the event of a subsequent disorder or breach of the peace assume and exercise the duties incidental to his official character.   *Jardine* v. *Cornell*, 50 N. J. L. 485 (1888);  14 A. 590;  Ann. Cas. 1913 D. 112.

The question whether in a particular case the doer of the act complained of was at the time acting in his official capacity or within the scope of his employment as a servant or employee is ordinarily a question of fact for the determination of the jury.   *Sharp* v. *Erie R. Co.* 184 N. Y. 100 (1906);  76 N. E. 923;  6 A. & E Ann Cas. 250;  *Tyson* v. *Bauland Co.* 186 N. Y. 397 (1906);  79 N. E. 3;  *Perkins Bros. Co.* v. *Anderson* 155 S. W. 556 (Tex. 1913).   *Deck* v. *Baltimore & O. R. R. Co.* supra.   *Layne* v. *C. & O. Ry. Co.* supra, 17 Ann. Cas. 639. note.   Ann. Cas. 1913 D. 114 note.   *Buman* v. *Michigan Cent. R. Co.* 168 Mich. 651 (1912);  134 N. W. 972.

It may, however, so clearly appear that the officer was acting only in his capacity as an officer, *Tolchester Beach Improvement Co.* v. *Steinmeier* 72 Md. 313 (1890); 20 Atl. 188; 23 L. R. A. (N. S.) 290 note; *Jardine* v. *Cornell* supra, *Healey* v. *Lothrop* 171 Mass. 263, or beyond the limits of any express or implied authority derived from or of any duty owed to the employer, *Pennsylvania R. R. Co.* v. *Kelley* 177 Fed. 189 (1910); 30 L. R. A. (N. S.) 481, that no conclusion, other than that the officer was not acting in his capacity as an employee, could reasonably be drawn, or the only reasonable conclusion may be that he was acting not as an officer but as employee, *Heggen* v. *Fort Dodge R. Co.* 150 Ia. 313 (1911) 130 N. W. 148, and consequently there is no issue for the jury.

The plaintiff has the burden of showing the express or implied authority of the officer to perform the injurious act for and on behalf of the defendant.    *Layne* v. *C. and O. Ry. Co.* supra.

We turn now, for the application of the foregoing principles to the instant case.

The defendant conducted a moving picture theatre known as the Portland Theatre.    George B. Gordon was the manager.    Benson had been employed about a year at the time of the alleged assault on March 4, 1924.    He had been, upon the written request of the defendant, appointed by the City Council of Portland special policeman at the Portland Theatre.    The council made similar appointments for other theatres.    His services were paid by the defendant and by the week.    These services were, as testified by him, in the morning cleaning up about the theatre; on one morning a week distributing in shops and stores advertising posters; usually in afternoons, when the ticket taker was off duty, taking tickets; in the evening he put on his uniform and was stationed in the balcony and ordinarily the only one there; he did not show patrons to seats, they found their own.    Two flights of stairs led on the right and left from the lobby or orchestra floor to the balcony and into a passage way, which circled around behind the balcony seats and the moving picture booth in the center of the theatre and from which two aisles led down to the front of the balcony for patrons to reach the seats.    Benson testified "after I put on my uniform at night I go up stairs and see that they keep the peace up there."    There were these questions and answers:    "What are your duties at the Portland Theatre when you

are working there?"  "Special officer."  "What else do you do up there?"  "Nothing only preserve order and see that nobody fires paper or causes disturbance."  "Your duties as such special officer were what?"  "To keep order, to keep the aisles clear on account of the fire rules and keep quietness."

As a public officer, Benson was a peace officer.  Rev. Stats. Chap. 85, Sec. 58; *Quimby* v. *Adams* 1 Me. 332.  The defendant claimed that the employment of a special officer for duty at its theatre was not optional with the defendant but required by ordinances of the city.  But there was no evidence of such ordinances and judicial notice cannot be taken of city ordinances by this court; 15 R. C. L. Sec. 16, 1077.

As a peace officer, Benson's sole duty was to preserve the public peace and to arrest those who were engaged in a breach thereof, *Foster* v. *Grand Rapids Ry. Co.* supra; *Rucker* v. *Barker* 151 S. W. 871 (Tex. 1912).

As an employee, his duty was to protect the defendant's property and to maintain order upon the premises.

"It was necessary to the business of the defendant that he should so conduct his resort as to make it attractive to his patrons.  This required him to restrain some who might be rude and boisterous and thus prevent the annoyance of others.  Many acts which are not criminal but are offences against good manners and good order, the defendant would be justified in restraining and with authority could declare he would not permit such conduct on his premises.  But such acts would not thereby become misdemeanors for which the police constables in his employ could arrest an offender as for the commission of a crime.  It was in furtherance of this policy that the defendant employed Henry and his associates.  In many ways it is apparent that it would be of advantage to the defendant to employ men who were police constables; but while they were thus employed, they were his servants and he was responsible for their acts in the course of their employment.  It would also be of advantage to the defendant to have upon his premises and in his employ some person or persons with legal authority to make an arrest if a crime should be committed on his grounds.  Insofar as such servants made an arrest for the commission of a crime they were acting as police constables; but when they were patrolling his grounds and his buildings restrain-

ing the boisterousness or the rudeness of his patrons and regulating good order among them, such employees were acting as his agents and not as police officers." *Rice* v. *Harrington*, supra.

It appears from the evidence that the plaintiff, Neallus and a companion, Brown, came to the theatre about eight in the evening, when the pictures were on, purchased tickets for the first or orchestra floor, but instead of entering went up the right stairway leading from the orchestra lobby into the balcony. The plaintiff stated they did so because he wished to speak to a man whom he saw going into the balcony. The ticket taker, Bailey, who was stationed in the orchestra lobby, stated that he asked them why they were going up stairs, to which the plaintiff replied, "Just for the fun of it," and he told them if they went up, to stay. Neallus and Brown stepped out into the passageway in the balcony which has been described, and stood there. Near them, also standing in the passageway and leaning against the rail between the passageway and the seats, was the wife of Benson. As to what was said and done in the balcony, the witnesses were Neallus, Brown, Benson and his wife.

According to Neallus and Brown, Benson came over to them and told them they must secure seats, of which, admittedly, there was ample supply; they told him they had seats down stairs, were looking for a man, and, as soon as they saw him, would go below. Benson said, "All right" and moved away and Neallus made a remark about him which Mrs. Benson overheard; she at once charged them with calling him a foul name, which they denied. Benson came back and his wife told him what he had been called and he at once told them to go out and began to push and drive them down stairs, using his club; they reached the orchestra floor, Brown having jumped ahead, and they then turned down the stairs leading from the orchestra floor to the theatre entrance; they remonstrated with Manager Gordon, who, with Bailey, the ticket taker and also a special police officer, was standing near the door into the orchestra, and wanted to know why they were being put out and he told them to keep on; that as the plaintiff began to descend the entrance stairs, Benson reached down and struck him a hard blow with his club on the back of the head.

According to Mrs. Benson, Neallus and Brown were noisy as they came in, had their hats on and blocked the aisle; Benson came over

and requested them to stand aside; they said they had tickets for down stairs and he told them to go down stairs, and one of them defied him to make him go down; as Benson moved away to go down the aisle, the plaintiff called him the foul name "and made him so mad he came back and said, 'You fellows have come up here for a fight, isn't you?'" Both of them seized him and struck him; he grabbed his club which they tried to take; Brown rushed ahead but the plaintiff and Benson struggled down the balcony stairs to the top of the entrance stairs where the plaintiff kicked Benson, who thereupon struck him, and the plaintiff went down the stairs.

According to Benson the two stood with hats on in the passageway blocking it and he asked them to step aside; they were noisy and he told them to keep quiet; he moved away and they said something to his wife; he came back, as they were still in the aisle and his wife told him what they had said, "My wife told me what they told her and they was arguing with her and I ordered them out of the theatre. They asked me who I thought I was and took hold of me and shoved me up against the wall. I was going to take them down stairs to arrest them because they refused to go out of the theatre. I ordered them out of the theatre; they refused to do it; they absolutely refused to go out. So they took hold of me, shoved me up against the wall, still holding on to me. I struggled with them till I got them down stairs. Never used no club. Never took no club out of my pocket, nor even offered to attempt to strike them. As I got them down stairs, the office stairs, these two fellows who had hold of me, fired me over against the stair, and this Neallus turned around and kicked me in the intestines and I gave it to him, I gave him one whack. That was on the stairway going down towards the street."

Gordon and Bailey stated that Benson was pushing and pulling along the two, who were resisting Benson in ordering them out and that one of them asked Gordon what he was being put out for and Gordon replied, "I have nothing to do with it. Go on."

One witness, called by the plaintiff, a stranger to him at the time and apparently disinterested, was coming into the theatre with his little boy and was part way up the entrance stairs when Neallus and Brown appeared. He stated they had just come around the corner of the orchestra corridor to come down the entrance stairs, were together, when an officer in uniform also came around the corner; "it

seems as though he hung on the corner and walloped him like that (indicating) and then dodged out of sight and I didn't see him from that time on."

Without process Benson could not have arrested Neallus unless he had been guilty of a breach of the peace in his presence. *Caffinni* v. *Hermann*, 112 Me. 282.

There was evidence from which the jury might have found that the plaintiff had, as said in *Harrington* v. *Rice* supra, "disturbed the good order of the place and had done one of the things which the defendant had employed (Benson) to prevent and suppress." A more difficult question would be whether the plaintiff committed an offense "against the law for which he could be arrested or detained for a longer time than was necessary to eject him" from the theatre. The jury might have so found.

Did Benson arrest the plaintiff? He did not so inform the plaintiff or Brown and they testified they were not arrested that evening or after. Benson's testimony varied. On his direct examination he said, "I was going to take them down stairs to arrest them because they refused to go out of the theatre." In cross examination he said, "I placed him (Neallus) under arrest up stairs and was taking him down stairs when he pulled me over there." Neallus testified that after the blow and he reached the foot of the entrance stairs he directed a boy to go up to the square and "get me a police officer." Shortly after, an officer, Newell, came in. Neither Benson, Gordon or Bailey sent for him or summoned police or the police wagon. Bailey told Newell the men were under arrest and to take them out. He did not do so. Neallus and Brown, at Newell's suggestion as they state, went to the police station to have the wound on plaintiff's head treated. Newell did not detain them and no proceedings were begun by Benson or Gordon.

On the evidence which was conflicting, even as between Mr. and Mrs. Benson, and Gordon and Bailey, the jury might have found that Benson had not arrested the plaintiff, if he would have been justified in so doing, and that what he intended to do and, so far as he could do, did, was to order the two to leave the theatre and forcibly to eject them upon their refusal to go.

If Benson was at the time of the assault making an arrest for the commission of a crime, he was acting as a police officer and the de-

fendant would not be responsible, although he used excessive force in so doing.

If he was not so acting but had been employed to protect the business of the defendant and to maintain order on the premises and he was at the time discharging the duties of such employment but did so in a negligent or wanton manner the defendant was liable.

These were questions of fact for the determination of the jury. There was ample evidence from which they could find that Benson acted not as an officer but as employee and within the scope of his employment and the defendant was liable.

There was also evidence from which the jury could have found that the defendant approved Benson's acts, because its manager was present, saw what was being done, had full knowledge of the ejectment and in the midst of it directed the plaintiff, who asked him why, to keep on going. In reply, however, to the question "Didn't it concern you whether one of the patrons was being put out?" he answered, "Not a bit."

The presiding justice therefore rightfully submitted the case to the jury. The exception is not sustained.

The motion raises the same questions that were raised by the exception and is determined by the disposition of the exceptions.

No question as to the amount of the damages found by the jury is raised by the defendant.

The mandate must therefore be

*Exceptions and motion overruled.*