STATE OF CONNECTICUT *v.* JAMES M. SOBER

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, JS.

Argued December 7, 1973—decision released February 26, 1974

*Ira B. Grudberg,* for the appellant (defendant).

*Donald B. Caldwell,* state's attorney, for the appellee (state).

MacDonald, J.   The defendant, James Mark Sober, was charged in a four-count information with (1) breaking and entering with criminal intent in violation of § 53-76 of the General Statutes and with personal violence in violation of § 53-78, (2) inciting injury in violation of § 9 of 1969 Public Act No. 452, and (3) two counts of assaulting a police officer in violation of § 2 of the same public act.[1] After a trial to a jury he was found guilty of breaking and entering without permission, of inciting injury, and of one count of assaulting a police officer.   The defendant has appealed from the judgment rendered on the verdict.

The defendant has assigned as error (1) the court's denial of his motion to dismiss the information "and/or" for a preliminary hearing, (2) its denial of his motion for directed verdicts of acquittal on all four counts, (3) its denial of his motion to set aside the verdict, (4) its refusal to charge the jury in accordance with his requests to charge, (5) the court's charge to the jury, (6) a ruling on evidence, and (7) the sentence imposed by the court.

The state offered evidence to prove and claimed that it had proved the following facts:   Between 11:30 p.m., April 23, 1970, and 12:45 a.m., April 24, 1970, John J. Manning, Jr., associate dean of students at the University of Connecticut (called university), became aware of a crowd marching around the campus of that institution and of the fact that members of the crowd had expressed the intention

---

[1] Section 53-78 of the General Statutes and the relevant sections of the public act in question have since been repealed with the adoption of the Penal Code.

of proceeding to Gulley Hall and taking it over. Gulley Hall is the property of the state of Connecticut and houses, among other offices, that of the president of the university. Manning arrived at Gulley Hall at about 12:10 a.m. and met Officers Joseph Bonafine and James Liszewski and other members of the university's security police. Manning asked Bonafine and Liszewski to stand immediately in front of the two locked outer doors and took up a position about eight paces in front of them. The crowd first collected in back of the building, then came around to the front and formed a semi-circle with the defendant and two other persons dead center in the arc of people. Manning was within five or six feet of Sober. Sober shouted: "Let's take them, let's take the building" to those around him, whereupon twenty to forty people charged Manning. As the crowd charged the building, Manning, Bonafine and Liszewski were pinned against the front door. Sober hit Bonafine with his left elbow, then turned around and kicked in the right window of the front door. Bonafine grabbed Sober and they started to wrestle around, and Sober grabbed Bonafine by the neck, ripped his tie off, and hit him on the left eye. After the glass was kicked in, approximately forty people surged past and into the building. A few minutes later Manning saw Sober come back out of the building and climb on the shoulders of a young person standing near the door and he both saw and heard him make a speech to the crowd that remained, urging them to come in and help "hold the building." Sober then went back inside. Manning heard glass break and judged that the windows were broken from the inside of the building because glass fragments came out and hit the ledge.

John Francois, another officer of the university
security police, entered the building while it was
occupied because he had heard that someone was
injured in the smashing of the glass doors. Upon
entering the building, Francois saw forty to sixty
individuals, including Sober. Francois testified that
Sober came up behind him shouting obscenities and
forcefully put Francois out of the building by push-
ing and shoving him out. On the night of the dis-
turbance Bonafine was wearing his badge and Fran-
cois and Liszewski were wearing uniforms and
badges. Bonafine and Francois had commissions
from the commissioner of state police delegating
to them the powers of state policemen "in the build-
ings and upon the lands of the University of Con-
necticut,"[2] and the badges worn by them and Lis-
zewski read "special state policeman." Each of the
three officers also was a duly appointed constable in
the town of Mansfield.

The defendant Sober was in Gulley Hall for
approximately two hours. His purpose was to hold
the building if he had enough support, and his
general purpose in holding the building was to stop
university functions. Holding the building meant
keeping the police out. When John Sandberg, assist-
ant director of the physical plant at the university,
inspected Gulley Hall at about 3:00 a.m. on April
24, he observed several cases of broken window

[2] The commission held by Joseph Bonafine, identical in relevant
part to that of John Francois, read as follows: "State of Con-
necticut, To All People to whom these presents shall come, greet-
ings: Know Ye That I, Leo V. Mulcahy, Commissioner, Department
of State Police, State of Connecticut by virtue of the Statutes do
by these presents commission and delegate the powers of a State
policeman upon Joseph Bonafine and the said person is empowered
to act as a State Policeman in the buildings and upon the lands of
the University of Connecticut."

glass, broken door glass, a damaged door handle on the president's office door, and a damaged door on the third floor. Thirteen windows were broken, including the two on the front doors. The cost of the damage came to slightly over $500.

The defendant first assigns error in the court's denial of his pretrial motion to dismiss "and/or for a Preliminary Hearing." The defendant based this motion on the claim that he was denied the assistance of counsel at a critical stage of the proceedings in violation of his rights under the fourteenth amendment to the United States Constitution. The gist of this contention is that the accused had not been afforded counsel when he was presented in Circuit Court and that, as a result of his lack of counsel, he waived his right to a hearing in probable cause and the corresponding right to examine and cross-examine the witnesses against him. We find no merit in this contention.

The record discloses that Sober was brought to the Superior Court on a bench warrant and was not bound over from the Circuit Court. No bindover was ever received by the state's attorney. There is no right to a hearing in probable cause, or bindover hearing, in the Circuit Court. *State* v. *Stallings,* 154 Conn. 272, 277–78, 224 A.2d 718. The power of the state's attorney to file an original information is deeply rooted in the common law; *State* v. *Stallings,* supra, 278; and "[t]he procedure which was followed in this case has been the practice in this state for a great many years and serves the desirable end of expediting the disposition of criminal cases to the mutual benefit of the defendant and the state. *State* v. *Hayes,* 127 Conn. 543, 581, 18 A.2d 895; *State* v. *Chin Lung,* 106 Conn. 701, 720,

139 A. 91." *State* v. *Stallings,* supra, 278–79; *State* v. *Purvis,* 157 Conn. 198, 206, 251 A.2d 178, cert. denied, 395 U.S. 928, 89 S. Ct. 1788, 23 L. Ed. 2d 246. The service of the Superior Court bench warrant superseded the Circuit Court mittimus and brought the defendant under the jurisdiction of the Superior Court. *State* v. *Purvis,* supra. Even if the defendant had not waived a hearing in probable cause, the state having chosen to proceed by way of a bench warrant rather than by the bindover procedure, it would not have been necessary to hold such a hearing. Thus, the point at which the defendant waived such a hearing clearly was not a critical stage in the proceedings before us.

The defendant nonetheless argues that *Coleman* v. *Alabama,* 399 U.S. 1, 90 S. Ct. 1999, 26 L. Ed. 2d 389, which held that counsel must be provided at a preliminary hearing even where such a hearing is not a required step in a prosecution, as is the case in this state, requires us to reverse the court's ruling. The crucial weakness in this argument, however, is that in *Coleman* the prosecution chose to conduct a hearing and did in fact do so and the state refused to appoint counsel for the defendant at the time of the hearing. Here the state chose to proceed in an entirely different manner; no hearing was held under the bench warrant, nor was the state required to hold one even without the waiver of such a hearing by the defendant. The rule established in *Coleman,* therefore, simply does not apply to the case before us.

The defendant's next claim, raised by his assignments of error relating to the denial of his motion for directed verdicts, the court's refusal to charge the jury as he requested and the court's eventual

charge, is that the university policemen were not state policemen within the meaning of §§ 2 and 9 of Public Act No. 452 of the 1969 Public Acts of the legislature.[3] The court instructed the jury that as a matter of law the officers must be considered to be state policemen.

Section 29-18 of chapter 529 of the General Statutes, entitled "State Police Department," gives the commissioner of state police the authority to "appoint one or more persons nominated by the administrative authority of any state buildings or

[3] The relevant portions of Public Acts 1969, No. 452, read as follows: "AN ACT CONCERNING PREVENTION OF THE OBSTRUCTION OF PUBLIC SERVICES AND PROTECTION OF FIREMEN AND POLICEMEN.

"Section 1. (a) This act may be cited as the act to protect public services. (b) For the purposes of this act (1) 'police officer' means a member of a regularly organized police department of a municipality who is responsible for the prevention or detection of crime and the enforcement of the general criminal laws of the state, a 'uniformed constable who performs the aforesaid duties full time or a member of the state police force . . . .

"Sec. 2. Any person who makes an assault upon a police officer or a fireman while such officer or fireman is performing his official duties is guilty of an aggravated assault and shall be subject to the penalties provided in section 53-16 of the general statutes.

.        .        .        .        .

"Sec. 9. Section 53-44 of the general statutes is repealed and the following is substituted in lieu thereof: Any person who, in public or private, orally, in writing, in printing or in any other manner, advocates, encourages, justifies, praises, incites or solicits the unlawful burning, injury to or destruction of any public or private property or advocates, encourages, justifies, praises, incites or solicits any assault upon any organization of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2, or the police force of this or any other state or upon any officer or member thereof or the organized police or fire departments of any municipality or any officer or member thereof, or the killing or injuring of any class or body of persons, or of any individual, shall be fined not more than five thousand dollars or imprisoned not more than ten years or both."

lands to act as special policemen in such buildings and upon such lands. Each such special policeman shall be sworn and may arrest and present before a competent authority any person for any offense committed within his precinct." As noted, Officers Bonafine and Francois had been issued documents delegating to them "the powers of State [policemen]" and empowering them to "act as state [policemen] in the buildings and upon the lands of the University of Connecticut" by the commissioner of state police. The defendant does not question the validity of these commissions, but he does maintain that the status thereby conferred was not that of a state policeman within the meaning of the statutes under which the defendant was charged. In support of this proposition he introduced a great deal of evidence demonstrating differences in job qualifications, pay scales, pension terms and other administrative provisions between the university special police and the regular state police.

There is, of course, no question that the university police are not members of the regular state police force as defined in § 29-4 of the General Statutes. The issue presented, therefore, is whether they were nonetheless within the class sought to be protected by the provisions of the statutes under which the defendant was charged. We find that they were.

Although § 29-18 is couched in the words "special policemen," the obvious intent of the legislature was to clothe these policemen with the powers of state policemen "in such buildings and upon such lands" as may be "within his precinct." That their powers were not to be limited or specialized in any sense is made clear by the wording authorizing them to

"arrest . . . *any* person for *any* offense." (Emphasis added.) This interpretation of their powers was clearly the one adopted by the state police commissioner in formulating the commissions granted to Bonafine and Francois, which "delegated" to them the powers of state policemen on university lands.[4] The fact that this is the interpretation placed upon the statute by the commissioner, who is charged with appointing such policemen, is entitled to weight in its construction. *Leach* v. *Florkosky,* 145 Conn. 490, 495, 144 A.2d 334; *Clark* v. *Town Council,* 145 Conn. 476, 485, 144 A.2d 327. Such an interpretation of the statute would be in accord with the general rule that special policemen are public officers when performing their public duties and when doing so assume all the powers and liabilities attaching thereto. See *N.L.R.B.* v. *Jones & Loughlin Steel Corporation,* 331 U.S. 416, 429, 431, 67 S. Ct. 1274, 91 L. Ed. 1575, rehearing denied, 331 U.S. 868, 67 S. Ct. 1725, 91 L. Ed. 1872; *Neallus* v. *Hutchinson Amusement Co.,* 126 Me. 469, 139 A. 671; *Dempsey* v. *New York Central & Hudson River R. Co.,* 146 N.Y. 290, 40 N.E. 867; *McKain* v. *Baltimore & Ohio R. Co.,* 65 W. Va. 233, 64 S.E. 18.

---

[4] The commissions, as noted, were issued "by virtue of the Statutes." The wording of the documents, particularly the use of the word "delegate," indicates that the commissioner promulgated them pursuant to § 29-18 as well as to § 29-10, which reads as follows: "[General Statutes] Sec. 29-10. COMMISSIONER MAY DELEGATE AUTHORITY. Any person may, and any deputy sheriff or policeman, with the consent of the authority to which he is subject, shall, go to any part of the state when required by the commissioner of state police, and, while so acting under the authority of the commissioner, shall have all the powers conferred on state policemen and shall be paid such sum as is fixed by said commissioner." While the full applicability of this statute to the University of Connecticut policemen need not be decided by us, it is relevant to the extent that it indicates that the commissioner meant to confer full state police powers on the University of Connecticut policemen.

In that the university police have all the powers of state policemen, it follows that they are entitled to all the protections afforded such policemen, including the protection offered by the statutes in question here. The legislature hardly could have intended the university police to have the powers of the state police, and thus of necessity to face the dangers encountered by the state police, while at the same time excluding them from statutory protections designed to minimize these dangers.[5]

The defendant quite correctly argues that a penal statute must be construed strictly. But it should not be defeated by unreasonably strict construction; *State* v. *Benson,* 153 Conn. 209, 215, 214 A.2d 903; or construed to the point of crippling the legislative intent. *State* v. *Cataudella,* 159 Conn. 544, 556, 271 A.2d 99; *State* v. *Scarano,* 149 Conn. 34, 39, 175 A.2d 360. Since the question of whether the university police were state policemen within the meaning of the statutes was clearly a question of law and not of fact; *Park Regional Corporation* v. *Town Plan & Zoning Commission,* 144 Conn. 677, 684, 136

---

[5] The legislative history of the act in question lends further weight to the position that the legislature must have intended to include the university police within the act's protections. In supporting the passage of the bill in the Senate, Senator Pickett stated: "All too often, we have seen examples of fireman [sic] try to fight a fire, perhaps during a *riot,* anytime, subject to being stoned, pelted by missiles, of course, *the same is true of policeman* [sic]." (Emphasis added.) 13 S. Proc., Pt. 5, 1969 Sess., p. 2163. It is a well known fact, and one which the defendant himself introduced evidence to prove in the case before us, that during the period 1967–70 a number of campus disturbances had taken place at the University of Connecticut and elsewhere. The legislature scarcely could have been unaware of this fact in passing the public act in question. In construing a statute a court considers its legislative history, language, purpose and the circumstances surrounding its enactment. *Delinks* v. *McGowan,* 148 Conn. 614, 618, 173 A.2d 488; *Cassidy* v. *Tait,* 140 Conn. 156, 160, 98 A.2d 808.

A.2d 785; the court properly instructed the jury to the effect that they were state policemen as a matter of law.[6] *State* v. *Marx*, 78 Conn. 18, 28, 60 A. 690; Maltbie, Conn. App. Proc. § 71. Our determination on this issue is also dispositive of the defendant's claim that the court erred in allowing Bonafine to testify that he was a state policeman. We need not decide whether the court did so err in that its subsequent charge on the issue clearly rendered any possible error harmless.

The defendant next argues that the state failed to prove that the defendant, when he entered Gulley Hall, intended to commit a crime therein, one of the elements of the crime charged in the first count of the information.[7] There is no question that it was incumbent upon the state to prove an intent to commit a crime because intent to do so is an element of the crime charged. *State* v. *Bitting*, 162 Conn. 1, 5, 291 A.2d 240. The defendant maintains that there was no evidence of such an intention and that his motion for a directed verdict of acquittal should have been granted.

"Intent may be, and usually is, inferred from conduct. *State* v. *Cofone*, 164 Conn. 162, 164, 319 A.2d 381; *State* v. *Smith*, 157 Conn. 351, 354, 254

---

[6] The defendant argues that the portion of the charge in question was "clearly error" in regard to Officer James Liszewski, who at the time of the incident did not hold a commission as a special state policeman. Liszewski was not named in either the information or in the bill of particulars as one of the officers the defendant assaulted. Since Bonafine was a "policeman" at the time of the incident any failure to charge specially in regard to Liszewski for purposes of the incitement charge was, at most, harmless error.

[7] The defendant was charged with violating § 53-76 of the General Statutes, which reads, in relevant part, as follows: "Any person who, with intent to commit a crime therein, breaks and enters any building or vessel."

A.2d 447. Intention is a mental process, and of necessity it must be proved by the statements or actions of the person whose act is being scrutinized. *State* v. *Cofone,* supra, 164; *State* v. *Mazzadra,* 141 Conn. 731, 735, 109 A.2d 873. A person's intention is to be inferred from his conduct. *Kiernan* v. *Borst,* 144 Conn. 1, 6, 126 A.2d 569." *State* v. *Bzdyra,* 165 Conn. 400, 403, 334 A.2d 917. In the present case, there clearly was sufficient evidence to support a reasonable inference that the defendant intended to commit a breach of the peace and whether such an inference should be drawn was properly a question for the jury to decide. There was testimony from the defendant himself that he entered Gulley Hall with the intention of "holding the building," "keeping the police out," and "disrupting university functions," and there was evidence, which the jury might or might not credit, from Officer Francois that the defendant did in fact commit a breach of the peace inside the building by shouting obscenities and physically forcing Francois from the building. We note that the defendant does not attack the court's charge on the lesser included offense of breaking and entering without permission, the crime of which the jury found him guilty, so that the conviction on the first count must stand.

Lastly, the defendant asserts that the court unconstitutionally punished the defendant for the exercise of his first and sixth amendment rights by sentencing him more harshly than a codefendant who pleaded guilty.[8] This claim is apparently grounded

[8] The court reporter's notes of the sentencing proceedings in this case were misplaced. Neither the state's attorney nor the trial judge had any independent recollection that the defendant made the constitutional claims set forth above. The defendant's counsel, however,

in the fact that Manuel Stamatakis, a codefendant who was convicted, by plea, of breaking and entering without permission and breach of the peace, received a lesser sentence than the defendant.[9]

The defendant maintains that the evidence in his own trial had shown Stamatakis to be at least as culpable as he was (a novel assertion considering the fact that Stamatakis was not on trial), and that the harsher sentence imposed on the defendant was therefore a penalty against him for asserting his sixth amendment right to trial. The defendant also claims that because the state's attorney argued that the defendant should be sentenced more harshly because he was an "outside agitator"[10] who had "no business" at the University of Connecticut, any stiffer sentence would be a further violation of the defendant's first amendment rights.

We find this claim to be totally devoid of any merit. It is difficult if not impossible to compare sentences of different individuals even when the same crimes are involved. Here the defendant was also convicted of inciting injury and assaulting a police officer whereas Stamatakis, with whom he seeks to be compared, was not. "The elements which

asserts that he did in fact make the claims at that time. Because this is a criminal proceeding, and because the defendant cannot be faulted for the loss of the reporter's notes, we will consider the claim.

[9] Manuel Stamatakis received a sentence of one year imprisonment, suspended, after four months, a judgment that was later reduced by another two weeks. The defendant received an effective sentence of eighteen months' imprisonment, suspended after eight months.

[10] The state's attorney's remarks referred to evidence, introduced by the defendant himself, that the defendant, who came to Connecticut to attend Yale University, had taken a year off in order to be a "regional traveler" for the Students for a Democratic Society, a job which entailed traveling around the campuses in the Connecticut area to organize students around political issues.

enter into the fixing of the length of sentence after a finding of guilty are so numerous and many of them so intangible that even a marked differentiation between two or more defendants could rarely be held error as a matter of law." *State* v. *Mele,* 125 Conn. 210, 215, 4 A.2d 336. We do not even consider the assertion that Stamatakis was "equally as culpable" as the defendant, since Stamatakis was not on trial in this, or any other, case. The defendant makes no claim that the sentence imposed was not within the limits fixed by the state for the offenses charged. We have no discretionary power in such a case except where a trial court appears to have abused its discretion; *State* v. *Van Allen,* 140 Conn. 39, 44, 97 A.2d 890; and the trial court is allowed a wide discretion in the sources and types of evidence used to assist it in fixing the penalty within the limits prescribed by law. *Williams* v. *New York,* 337 U.S. 241, 246, 69 S. Ct. 1079, 93 L. Ed. 1337. We find no abuse of discretion on the part of the trial judge in imposing the sentence which it did in this case.

There is no error.

In this opinion the other judges concurred.